INMATES OF THE ALLEGHENY COUNTY JAIL, Thomas Price Bey, Arthur Goslee, Robert Maloney, and Calvin Milligan on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Cyril H. WECHT, President of the Allegheny County Board of Prison Inspectors and the other members of the Board: Thomas Foerster and William H. Hunt, Commissioners for Allegheny County; Frank J. Lucchino, Controller for Allegheny County, Eugene Coon, Sheriff for Allegheny County; the Honorable Patrick R. Tamilia, Michael J. O'Malley and Marion K. Finkelhor, Judges Court of Common Pleas of Allegheny County; Richard S. Caliguiri, Mayor of the City of Pittsburgh; Harriet McCray; Monsg. Charles Owen Rice and Charles Kozakiewicz, Warden of the Allegheny County Jail, and William B. Robinson, Executive Director of Prison Inspectors, and Cyril Wecht, Thomas Foerster and William H. Hunt, as Commissioners of Allegheny County, Defendants,

v.

COMMONWEALTH OF PENNSYLVANIA, Third–Party Defendant.

Civ. A. No. 76–743.

United States District Court,
W.D. Pennsylvania.

Nov. 17, 1988.

George C. Diamantopulos, Asst. Allegheny County Sol., Pittsburgh, Pa., for defendants.

Donald Driscoll, Neighborhood Legal Services Assn., Pittsburgh, Pa., for plaintiff.

Thomas F. Halloran, Office of Atty. Gen., Pittsburgh, Pa., for third-party defendant.

Lynette Norton, Sherman & Picadio, Pittsburgh, Pa., for Court Monitor.

## OPINION

COHILL, Chief Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Presently before the Court are (1) plaintiffs' Motion for Sanctions, (2) defendants'

Motion to Increase Population Cap at the Allegheny County Jail, and (3) third-party defendant's Motion to Dismiss. The recurring issue permeating this case is whether the inmates in the custody of defendant County of Allegheny, et al., ("County") are being housed under constitutionally adequate conditions. For the reasons set forth below, we will grant plaintiffs' Motion for Sanctions, conditionally grant defendant's Motion to Increase Population Cap, and deny third-party defendant's Motion to Dismiss.

Following a hearing on October 13 and 14, 1988, and a tour of the Allegheny County Jail ("Jail") and Jail Annex ("Annex") on October 13, 1988, we now make the following findings of fact and conclusions of law.

## I.

### FINDINGS OF FACT

With respect to the motions presently before the Court, we are generally considering only the old main facility, or Jail. The Annex, which was opened in 1986, and which can house up to 435 inmates, is at capacity but not unconstitutionally overcrowded. The Annex appears to be operating smoothly with the exception of difficulties related to female inmates suffering mental health problems. (*See infra* pp. 1141–42).

The Jail is a 102–year–old structure, used for every conceivable function related to the County's criminal justice system. It is a pretrial detention center housing unconvicted persons awaiting trial; unfortunately it must also serve as a detention unit for convicted state and federal prisoners awaiting sentencing, assignment or transfer to other institutions; it is also a prison for convicted state prisoners serving sentences of up to 23 months and for County prisoners convicted of misdemeanors who are serving short sentences. A number of inmates are in a work-release program. These are primarily fathers who have disobeyed child-support orders. They are housed in the Jail at night but are permitted to work at their own jobs during the day. The facility additionally houses prisoners brought to the Jail from other institutions to testify in federal or state trials. Only male inmates are housed in the Jail. All females are in the Annex.

The County attempted, through a law suit, to force the Commonwealth to house all convicted state prisoners in state facilities, but the Supreme Court of Pennsylvania ruled that the Commonwealth need not take prisoners whose sentences were less than twenty-three months. *See County of Allegheny v. Commonwealth of Pennsylvania*, 518 Pa. 556, 544 A.2d 1305 (Pa. 1988).

Although the Jail is orderly and clean, it is no longer constitutionally adequate. While superficially in good physical condition, considering its age, the structure falls far short of meeting contemporary standards. Conditions are a vast improvement over what they were when this case began in 1976. (See this Court's description of those conditions in *Owens–El v. Robinson*, 442 F.Supp. 1368 (1978)). However, there have been no structural changes made to the Jail to create additional bed space or to facilitate other activities at the Jail.

The housing structure of the Jail consists of the North, East, and West Blocks, two Mental Health sections, a Receiving Unit, and a Disciplinary Housing Unit. A total of 610 cells in the Jail are currently available for inmate housing.

The North Block consists of 47 cells which are 8' deep × 5' wide × 8' 10" high (40 sq. ft.).

The East Block consists of 250 cells which are 7' 8½" deep × 6' wide × 8' 1½" high (46.25 sq. ft.). Ten of these cells are used as mop rooms, one a supply room and one a nurse's station; thus, 238 cells remain for inmate housing.

The West Block consists of 210 cells which are 7' 8½" deep × 6' wide × 9' 3/4" high (46.25 sq. ft.). Like the East Block, ten of these cells are mop rooms, one a supply room and one a nurse's station; thus, 198 cells remain for inmate housing.

The two Mental Health units each have 20 cells which are 8' 10½" deep × 7' 1½" high (63.2 sq. ft.).

The Receiving Section has 63 cells. Twelve are used as mental health cells for new admissions. Each of these cells is 7' 7½" × 6' 1½" × 8' 1" high (46.7 sq. ft.).

Three ranges of cells comprise the Disciplinary Housing Unit. The "A" range has 8 cells which are 10' 10" deep × 6' wide × 8' 1" high (65 sq. ft.). The "B" range has 7 cells which are 9' 11" deep × 6' 6" wide × 8' 1" high (64.4 sq. ft.). The "E" range consists of 9 cells which are 7' 9" deep × 6' 6" wide × 8' 1" high (50 sq. ft.). Inmates are double-celled in 6 "B" range cells and in 5 "E" range cells. Thus, there are 30 bed spaces in that unit.

Every cell contains a sink with push button cold water, a seatless toilet, and mattress suspended from chains.

The gymnasium measures 45' 10" × 63'. This is the only large open area in the main facility. Although a court yard is available to the inmates, no real outdoor exercise facility exists. The Jail also contains a hospital room measuring 19' × 31' 6".

On any given day, approximately 20 cells are "down"—inoperable and unavailable for inmate housing. An additional 20 cells in the East and West Blocks have been converted into storage facilities or "mop rooms" for cleaning and maintenance equipment. The County seeks to convert these back to cells by removing the mop sinks and installing cots, wash basins and toilet facilities. This is where 20 of the requested 40 additional inmates would be housed.

The average daily inmate population in the main facility was 429 in 1976. By 1983 it had increased to 644. When this case was filed in 1976, the litigation focused on conditions at the Jail. Overcrowding was not a problem until 1983.

Pursuant to this Court's Order of February 28, 1985, we held that the maximum constitutional inmate population was 540 inmates. The number of inmates housed in the main facility is not to exceed that number after 5:00 p.m. on any day.

The County has violated that Order. The population limitation up to the date of the hearing had been exceeded as follows (inmates remaining at 5:00 p.m. in main facility after release of inmates per this Court's Orders of February 28, 1985 and of February 9, 1988):

8/27/88—567 inmates (27 over limit)
8/28/88—574 inmates (34 over limit)
8/29/88—545 inmates (5 over limit)
10/8/88—559 inmates (19 over limit)
10/9/88—567 inmates (27 over limit)
10/10/88—569 inmates (29 over limit)

These figures do not include persons received for incarceration after 5:00 p.m. on the noted days. Such commitments substantially increase the inmate population on a regular basis.

Recently the Population Control Manager resigned. This vacancy exacerbates the logistical problems of coordinating the inmate population. This position had been created by the County following the institution of this action. The person filling it was, according to the Warden, of great assistance in expediting releases, obtaining alternate housing and holding the prisoner population within the cap set by the Court.

Rarely does the main facility house fewer than 540 inmates at a time. If the number drops below 540, the occurrence is only temporary.

The population at the Jail is constantly in a state of flux. We had previously arbitrarily determined that, for purposes of the Court order, the population count should occur at 5:00 p.m. At this time work-release prisoners should have reported back, permitting jail personnel to determine the population. Problems arise, of course, when, although the population is 540 at 5:00 p.m., police later bring in more prisoners or pretrial detainees.

In the future the physical demands on the structure are only going to multiply. The population of the main facility will continue to grow through the year 2000. The Kimball Report[1], commissioned by the County and issued in 1985, recommended

---

1. L. Robert Kimball & Associates, *Allegheny County Criminal Systems Facility Report Fea-* *sibility Report* (1985) (commonly known as the "Kimball Report.")

that the County have facilities to house 1,095 inmates by 1990 and 1,339 inmates by the year 2000. These projections appear to be low, since even today the average daily population at the Jail alone would approximate 620 inmates if no releases occurred. When this is added to the 435 inmates housed in the Annex the total is 1055. At the hearing on this matter on October 13, 1988, an expert in demographics, Hunter Hurst, testified that the County will require a total jail capacity for 1300 inmates by 1995 and 1400 inmates by the year 2000.

The County has attempted to meet the problem but with only partial success. In 1986 the County opened the newly constructed Annex, a block from the Jail, to house 435 prisoners. The County also obtained a facility for approximately 25 non-violent offenders. This is a former post office in Homestead, Pennsylvania, which is not yet open. The County is investigating a facility in New Brighton, Beaver County, Pennsylvania, for housing non-violent offenders and considering converting the 13th floor storage area at the Annex into additional housing for 16 inmates. Currently in very early planning stages, these latter two possibilities are at best tentative and, if completed, will not put much of a dent in the problem. The County has also commenced an electronically monitored House Arrest Program. As of October 14, 1988, 31 prisoners were being confined to their homes under the program.

These stop-gap measures are not sufficient to handle the present requirements of the County, let alone future needs stemming from the large projected increases in inmate population. Other conditions at the Jail indicate its inadequacy to serve as a constitutionally adequate institution for prisoners.

The old, unreliable, unsafe heating plant is totally inadequate. The system breaks down regularly each winter. The master locking systems, which allow prison personnel to lock or unlock a complete row of cells at one time, do not work properly. This deficiency creates an obvious danger in the event of fire.

The ductwork lacks smoke or fire detectors that would effect an automatic shutdown should a fire occur. Smoke, delivering toxic products through the return air ductwork, would cause a hazardous condition throughout most areas of the Jail. The Jail lacks a sprinkler system. On our latest inspection no emergency evacuation plan was posted. We note that this Court's Order of October 11, 1978 required such a plan. *See* Item 29 of that Order.

Due in large part to the lack of adequate space the quality of the physical and mental health care provided to inmates is deteriorating.

The County does not provide for or require psychiatric training for its nursing staff, nor must applicants for nursing positions have psychiatric nursing backgrounds. One third of the normal complement of eighteen nursing positions is vacant. An insufficient number of full-time nurses remain available at the Jail. We note that the deficiency in psychiatric nursing services violates this Court's Order of May 15, 1983. *See* Item 11.

The beds in the Jail's mental health unit are regularly filled to capacity. The Jail does not provide a nurse to cover the Mental Health Unit on a full-time basis during the 11:00 p.m. to 7:00 a.m. shifts and 3:00 p.m. to 11:00 p.m. shifts. This also violates this Court's Order of May 25, 1983. *See* Item 11.

Once a mentally ill inmate has been legally determined to be a danger to himself or to others delays of up to 30 days precede an actual transfer to a state psychiatric facility. Additional delay in transferring seriously mentally ill inmates for necessary care and treatment is at least partially attributable to a lack of accreditation for the Mental Health Unit. Because the Jail itself is not accredited, the psychiatric staff must first refer a seriously ill inmate to the Allegheny County Behavior Clinic for commitment proceedings.

The female mental health personnel log indicates that a psychiatrist visited the female mental health cells only 12 times over a 67-day period from August 1, 1988 through October 6, 1988. We note that

this omission applies to the Annex, the only facility where female inmates are held.

In 1986, the County formed an Ad Hoc Committee on Jail Medical Procedures, chaired by Gilbert A. Friday, M.D. The purpose of the Committee was to recommend improvements to Jail medical procedures.

The Committee recommended, *inter alia,* the implementation of continuing education opportunities for all mental health personnel, the hiring of additional and better qualified nurses, the training of the nursing and physician staff in emergency medical care, and increasing the availability of psychiatric services to inmates. *See The Report of the Allegheny County Jail Ad Hoc Committee on Jail Medical Procedures,* 9–16 (April 2, 1987).

In response to the Committee's report, the County is currently negotiating a contract with Correctional Medical Services ("CMS") of St. Louis, Missouri, to operate medical services at the Jail. The County expects a final arrangement with CMS soon, with the objective that CMS will implement the Committee's recommendations by January 1, 1989.

## II.

### CONCLUSIONS OF LAW

The defendants have committed and condoned serious violations of various orders of this Court. We are disturbed particularly that the population caps were violated, not by negligence or mistake but consciously and with full knowledge that this Court's orders were being violated. The County made no effort to come back to the court to seek relief.

The courts don't operate in a vacuum. At the trial level we "see the bodies," whether they be civil litigants, criminal defendants, victims of crime or inmates of the Allegheny County Jail. Since our first visit to the Jail in 1977 we have been well aware

of the problems, not only of the inmates but those of County officials. We have written reams of opinions and orders on the subject.[2]

Throughout this twelve-year period, this Court has attempted to use restraint by not superimposing on the County Commissioners what this judge thinks needs to be done; they, after all, are the duly-elected representatives of the citizens of this County.

Rather than ordering that a new jail be built, we imposed a population cap on the original jail facility. This resulted in the Annex being constructed. As noted in the Findings of Fact above, the average daily population in the Jail was 429 in 1976. In 1983, it had jumped to 644. On one day that we toured the jail (May 5, 1983), it was 705.

Again, setting the cap was not done precipitously. We ordered a population reduction in steps beginning on July 1, 1983 and giving the County until January 1, 1984 to reduce the jail population to 530. By Order of February 28, 1985, we increased the cap to 540 but also ordered the County to obtain additional facilities for prisoners over the cap or release them and be fined for releasing them. The County released many prisoners and piled up about 2 million dollars in fines. It also built the Annex, and we then agreed to forgive the fines.

Now we are back to square one; even though the Annex can house 435 prisoners, the County has again started releasing prisoners in some cases and in others has simply violated this Court's orders.

Judges often have to go through what are called "balancing tests" by the lawyers. In a criminal trial, for example, if an item of evidence is technically admissible, the judge must decide whether the possible unfair prejudice to the defendant outweighs the probative value (proof) of that evidence. A typical example is whether or

---

**2.** *Inmates of Allegheny County Jail v. Wecht, et al.,* 612 F.Supp. 874 (W.D.Pa.1985); 573 F.Supp. 454 (W.D.Pa.1983); 565 F.Supp. 1278 (W.D.Pa. 1983); *Inmates of Allegheny County Jail v. Peirce,* 487 F.Supp. 638 (W.D.Pa.1980); *Owens-*

*El v. Robinson,* 457 F.Supp. 984 (W.D.Pa.1978); 442 F.Supp. 1368 (W.D.Pa.1978). The foregoing are only the published opinions; we have also written many unpublished orders and memoranda.

not to let the jury know about a prior conviction of the defendant.

Well, in this case the time has come for another kind of balancing test. The prisoners are not entitled to a country club or hotel, but they are entitled to be housed in constitutionally humane conditions. The County is obliged to provide such conditions. But the County also has an obligation to its citizens to protect them from dangerous people.

In complying with the population cap, the County released pretrial detainees on "own recognizance" or "OR" bonds. These came to be known as "Cohill bonds" as a result of this Court's Orders. While it must be kept in mind that prisoners released on so-called "Cohill bonds" have not been convicted of anything and would have been released anyway if they had been able to "make" their bonds, nevertheless having a judge be responsible for wholesale releases rather than utilizing the deliberate judicial process for each case as provided by the law is simply a distortion of the law. The problem has now been compounded by the Warden deliberately violating our orders which set the population cap.

This method of operating can't continue indefinitely. The balance now tips in favor of protection of the citizens; the County cannot postpone the inevitable; it must provide adequate facilities for all of its prisoners. We conclude today that the Jail is no longer constitutionally adequate.

■ The main facility houses not only convicted inmates but pretrial detainees who are only accused of crimes. Pretrial detainees have due process rights under the fifth and fourteenth amendments and are entitled to non-punishing jail conditions. *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). Pretrial detainees may not be held under punitive conditions, because they are still cloaked with the presumption of innocence. *Reece v. Gragg,* 650 F.Supp. 1297, 1300 (D.Kan. 1986). Sentenced inmates may be held under conditions that are punitive, as long as the punishment is not incompatible with societal standards of decency and does not constitute cruel and unusual punishment.

*Id.* However, where a correctional facility, such as the Jail, houses both types of inmates and does not segregate them, non-punishing conditions must be provided.

Overcrowding becomes punishment when it "subjects a detainee over an extended period to genuine privations and hardship not reasonably related to a legitimate governmental objective." *Lareau v. Manson,* 651 F.2d 96, 103 (2d Cir.1981). All inmates are entitled to protection from an environment where degeneration is probable and self-improvement is unlikely because of conditions which inflict needless physical or mental suffering. *Capps v. Atiyeh,* 495 F.Supp. 802, 813 (D.Ore.1980).

■ Our inquiry, then, is whether the totality of conditions "deprives inmates of the minimum civilized measures of life's necessities." *Rhoades v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed. 2d 59 (1981). We find that the totality of conditions at the Jail, including the lack of adequate living space for inmates, the deplorable mental health facilities, fire hazards and the lack of reliable climate control, deprive inmates of the minimum necessities of life. The Jail is therefore a constitutionally inadequate facility.

While no consensus among courts exists regarding the minimum number of square feet that should be provided to an inmate, courts recognize that the fifth (due process), eighth (cruel and unusual punishment), and fourteenth (also due process) amendments demand some minimum, and our review of the cases indicates that the figure is 60 to 70 square feet per cell.

In *Battle v. Anderson,* 564 F.2d 388, 395 (10th Cir.1977), the Tenth Circuit Court of Appeals adopted the 60 square feet standard set by the American Public Health Association noting that "[m]inimum space to call one's own is a primary psychological necessity. Without the basic minimums prisons are doomed to failure, with both society and the inmates incarcerated therein the losers." The institution that the *Battle* court examined housed convicted sentenced inmates but not pretrial detainees.

Other courts have attempted to set a constitutional minimum as to the amount of square feet to be provided each inmate. *See Ahrens v. Thomas,* 434 F.Supp. 873, 901 (W.D.Mo.1977) (70 sq. ft. min.); *Anderson v. Redman,* 429 F.Supp. 1105, 1119 (D.Del.1977) (60 sq. ft. min.); *Pugh v. Locke,* 406 F.Supp. 318, 334 (M.D.Ala.1976), *aff'd,* 559 F.2d 283 (5th Cir.1977) (60 sq. ft. min.).

The American Correctional Association ("ACA") provides "current standards deemed appropriate by detention facility managers and recognized organizations representing corrections." ACA, *Standards for Adult Local Detention Facilities,* xiii (2d ed. 1981). With respect to living space, the ACA recommends that "[a]ll single rooms or cells in detention facilities have at least 60 square feet of floor space, provided inmates spend no more than 10 hours per day locked in; when confinement exceeds 10 hours per day, there are at least 70 square feet of floor space." *Id.,* standard 2–5111. Discussing this standard, the ACA notes that "[a]dequate living space is important to the mental well-being of the inmate. Rooms or cells of sufficient size enable inmates to personalize living space consistent with facility rules and regulations." *Id.*

The National Clearinghouse for Criminal Justice Planning and Architecture recommends 70 square feet per inmate. The National Advisory Commission on Criminal Justice Standards and Goals recommends 80 square feet per inmate. The American Institute of Architects recommends 70 square feet per inmate.

While these recommendations, suggesting that inmates be provided with between 60 and 80 square feet of living space, do not establish constitutional minima, and are certainly not binding on this Court, they do provide guidance.

The living space provided to inmates in the main facility at the Jail does not even approach these recommendations. Cells in the North Block provide only 40 square feet of space. Cells in the East and West Blocks provide only 46.25 square feet of space. Cells in the Receiving Section provide only 46.7 square feet. While the cells in the Disciplinary Housing Unit provide between 50 and 65 square feet of space, many of these house two prisoners. These figures are all floor space dimensions and include floor areas which are covered by desks, bedding, and toilets.

These cells are simply too small to provide humane living conditions to inmates. It is evident that the Jail facility was constructed over 100 years ago solely for the purpose of locking people up and, with the passage of time, no longer meets community standards of humane treatment. While they may have been sufficient in 1886, they are clearly not tolerable in 1988.

Not only are the cells physically inadequate, but there is no way for this structure to be made adequate. In the past several months, the inmate population has regularly exceeded 540. Officials at the main facility are forced to handle an increasing number of individuals whether on a temporary or a permanent basis. Moreover, we are really just beginning to feel the effects of an ever increasing jail population. The overcrowding problem is not going to go away; as the testimony and evidence of record indicate, the situation will only get worse.

Overcrowding not only affects the physical housing of inmates, but the totality of the adequacy of their confinement. Areas for physical recreation are wholly inadequate for the number of inmates who seek recreation. The only areas available for the recreation of 540 plus inmates is the gymnasium which measures 45' 10" × 63', and a small court yard.

The physical limitations of the structure also affect the quality of other necessities of life such as the food service, the ability to shower, counseling, medical services and the myriad other activities necessary in a jail. Even without the current problem of overcrowding, we find that the Jail is now constitutionally inadequate.

The health services provided to inmates are wholly inadequate; this is not merely an administrative problem but one compounded by the lack of adequate space.

Currently, the Jail contains 40 mental health cells, 20 located in the Summary I unit on one floor and 20 located in the Summary II unit on another floor. An additional 12 cells are available on the "B" range in the general population to accommodate the overflow of mentally ill patients. All of the beds available to the mental health unit are regularly filled to capacity.

If mentally ill inmates are to be housed at the Jail, the professional staff must have adequate space, equipment and supplies. The American Medical Association sets three conditions that must be met if psychiatric treatment is to be provided at a jail: (1) a safe, sanitary, humane environment as required by sanitation, safety and health codes of the jurisdiction, (2) adequate staffing, security to inhibit suicide and assault (i.e. staff within sight and sound of all mentally ill inmates), and (3) trained personnel to provide treatment and close observation. American Medical Association, *Standards for Health Services in Jails*, at 10 (1981).

■ Failure to provide adequate treatment is a violation of the eighth amendment's prohibition against cruel and unusual punishment when it results from "deliberate indifference" to a prisoner's serious medical needs. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979) (citing *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291–92, 50 L.Ed. 2d 251 (1976)). At a minimum, the deliberate indifference standard must be met as to pretrial detainees. *Id.* at 762. In evaluating medical care, the "deliberate indifference" standard applies to both convicted prisoners and pretrial detainees. *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988). In other words the same level of medical care is required for both types of inmates.

Psychological or psychiatric care provided at a jail is constitutionally inadequate if inmates with serious mental illnesses are denied reasonable access to personnel qualified to diagnose and treat those illnesses. *Inmates*, 612 F.2d at 765.

The confined space at the Jail prohibits the construction and operation of constitutionally adequate mental health facilities. There is simply not enough room in the existing mental health units to house those inmates needing psychiatric care. During hearings conducted by this Court in April, 1980, the evidence established that a minimum of 10% and a maximum of 30% of the inmates in the Jail could be considered to be seriously mentally ill. As Warden Kozakiewicz testified at the hearing before this Court on October 13 and 14, 1988, many prisoners in the main population would be housed in the mental health units but for the lack of space.

The Ad Hoc Committee recognized the enormity of this problem in its April 2, 1987 report. The Committee noted the "physical limitations to a building erected a hundred years ago." It stated that more mental health space should be a high priority. Plaintiff's Exhibit 2, at 5–7. The Committee recommended that, since the County Engineering Department had determined that combining the two summary units would be prohibitively costly and impractical, a totally new site for a larger Mental Health Unit should be considered. *Id.* at 11.

The lack of space for adequate mental health units complicates the County's problem in attracting and retaining qualified nursing personnel to staff the units. Qualified nurses, consistent with their oaths to provide an acceptable level of nursing care, may well find practicing in the current jail environment a violation of those oaths.

We note particularly the deficiency in nursing service for mentally ill inmates who must, out of necessity, be housed with the general population. With respect to these inmates, for whose health the nurse accepts responsibility, she must depend upon security personnel, rather than her own experienced observations, to identify and alert her to the inmate's need for care. We applaud the efforts of the nurses now working at the Jail. However, because sparse nursing services must be spread among the three mental health units and even beyond those units into the general

population, inmates with serious mental illnesses are denied access to personnel qualified to diagnose and treat those illnesses. Therefore, current conditions amount to a constitutional violation. *See Inmates,* 612 F.2d at 765. Moreover, after twelve years of trying, it is apparent that the County is unable to provide constitutionally acceptable psychiatric care in this antiquated jail.

The Jail cannot handle the demands required of a modern jail facility. Neither can it meet the needs of this County's criminal justice system in the next decade. The totality of conditions in the Jail amount to unconstitutional punishment and violate the rights of the inmates housed there.

■ "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Moreover, lack of financing is not a defense to the failure of a county to provide minimum constitutional standards in its operation of a county jail. *Battle v. Anderson,* 447 F.Supp. 516, 526 (E.D.Ok.1977).

This Court is fully aware of the judicial restraint which federal courts must exercise in attempting to remedy constitutional violations in a correctional institution. We have respect for the allocation of functions in our federal system and for comity towards the County and the Commonwealth. To that end, we have attempted to exercise control over the last twelve years by fashioning what we deem to be conservative relief consistent with the policy of minimum intrusion into the affairs of the County's prison administration. However, it is now apparent that these measures were ineffective; the time has come to implement more stringent remedies. *See Ruiz v. Estelle,* 679 F.2d 1115, 1145–46 (5th Cir. 1982) ("Conservative treatment is essential because it is more readily administered, less costly to the state, and not irreversible.... If these measures later prove ineffective, more stringent ones should be

considered."), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

Courts have reacted to unconstitutional jail conditions in various ways. To deal with the physical condition of prisons, some courts have ordered extensive structural improvements, such as requiring a minimum number of square feet to be assigned to each prisoner for living space. *See Newman v. Alabama,* 559 F.2d 283, 288 (5th Cir.1977); *Gates v. Collier,* 501 F.2d 1291, 1303 (5th Cir.1974). Similarly, to deal with constitutionally inadequate mental and physical health care, at least one court ordered the construction of a new prison hospital. *Hamilton v. Landrieu,* 351 F.Supp. 549, 550 (E.D.La.1972). Finally, when no physical reconstruction efforts could improve a jail so as to meet constitutional standards, the United States Court of Appeals for the Second Circuit determined that the appropriate remedy was to close the old jail and transfer the prisoners to another facility. *Rhem v. Malcolm,* 507 F.2d 333, 340 (2d Cir.1974).

This Jail can no longer physically handle the burdens placed on it by the criminal justice system in Allegheny County. The Warden and his staff have made valiant efforts to keep the Jail clean and in repair. These attempts affect the structure only superficially. As a jail, time has passed this building by. While we have attempted less intrusive remedies with the population cap and release orders, they were unfortunately ineffective short term solutions. We have no choice now but to order that more stringent measures be taken.

Although apparently three courts have refused to order a county to build a new jail, such refusal was based primarily on the fact that such a remedy would not have solved the constitutional violations found in their cases. *See Madison County Jail Inmates v. Robert Baldwin, et al.,* No. IP 79–675–C (S.D.Ind.1980) (LEXIS Genfed library, Dist file); *Padgett v. Stein,* 406 F.Supp. 287, 303 (M.D.Pa.1975); *Jones v. Wittenberg,* 330 F.Supp. 707, 712 (N.D. Ohio 1971).

In *Jones,* the United States District Court for the Northern District of Ohio

determined that the problem with the county jail was not its physical structure, but the archaic policies and attitudes of the public officials operating it. *Id.* at 712. Therefore, the court determined that requiring construction of a new jail would be broader than necessary to remedy the constitutional violations. The court also believed that it had no authority to compel such a remedy. *Id.*

While we recognize the concerns expressed by these courts, the situation before us presents an additional dilemma not confronting those courts. Despite all of our efforts and orders over the last 12 years, the County has been unable to provide constitutionally adequate housing in this institution.

The problem with the Jail is that it is a fortress-like stone structure to which additional floor space cannot be added. Those same physical inadequacies prevent the County from remodeling it to meet constitutional standards, while at the same time accommodating current and future population demands.

We have determined that the conditions existing at the main facility are inadequate under the Constitution of the United States. There is no question that we may require the County to comply with the Constitution and provide constitutional housing to inmates.

The plaintiffs have presented substantial evidence of long existing and continuing constitutional violations at the main facility. Severe overcrowding, inadequate cell size, inadequate staffing and the insufficient medical and psychiatric services do not provide even minimally adequate care. These conditions can no longer be tolerated.

■ When the totality of conditions in a penal institution violates the Constitution, the trial court's remedies are not limited to the redress of specific constitutional rights. *Miller v. Carson,* 563 F.2d 741, 751 (5th Cir.1977). Rather, the nature of the violation determines the scope of the remedy. *Swann,* 402 U.S. at 16, 91 S.Ct. at 1276. Moreover, in fashioning a remedy for constitutional violations, federal courts must

order full and effective relief. *Smith v. Sullivan,* 611 F.2d 1039, 1044 (5th Cir. 1980). The fact that a remedy is costly does not preclude a district court from ordering that remedy. *Toussaint v. McCarthy,* 801 F.2d 1080, 1110 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

We believe that construction of a new jail and/or some alternative facility to provide constitutional inmate housing is required to eliminate continuing constitutional violations produced by the deplorable jail conditions long maintained by the County.

■ While the Court recognizes that the Pennsylvania Supreme Court held in *County of Allegheny v. Commonwealth of Pennsylvania,* 518 Pa. 556, 544 A.2d 1305, 1308 (Pa.1988), that state prisoners who are sentenced to less than two years confinement are properly in the custody of the County absent a proclamation from the Governor making state facilities available, the Court does not agree that the Commonwealth of Pennsylvania should be dismissed from this action.

If the conditions at the Jail violate the Constitution of the United States due to overcrowding and the Commonwealth has contributed to those conditions by availing itself of the Jail, we fail to see why the Commonwealth should be absolved from partial responsibility for such conditions. This Court has supreme federal equitable power to remedy unconstitutional confinement conditions. Accordingly, the Commonwealth's Motion to Dismiss will be denied.

### III.

### CONCLUSION

It has become increasingly clear that the Jail cannot be brought into the latter 20th century, let alone the 21st. Despite the heroic efforts of its staff, the physical facility itself is not capable of providing adequate housing for current and projected populations.

■ This Court has no choice other than to order that the Jail be closed. Recogniz-

ing that a new facility cannot be constructed nor alternate housing be located overnight but also realizing that the County's own consultants long ago recognized the space problems at the Jail, we will enter an Order that no prisoners shall be housed at the main jail after June 30, 1990.

The defendants shall submit to the Court a plan for construction of a new facility or alternate housing, accommodating at least 900 inmates, within six months of the date of this Order. For each month thereafter that such plan has not been filed, defendants will be fined a sum to be determined.

In the interim, and as a temporary measure only, we will grant in part the County's petition to house additional inmates in the Jail. Since it has been established that there are 20 additional cells in the main jail which have never been counted as cells in this litigation because of their conversion to utility rooms, our Order will permit inmates to be housed in those rooms as soon as they can be reconverted to cells to the Warden's satisfaction and that of the Court Monitor. In addition, it appears that constant maintenance has reduced the number of "down" or malfunctioning cells. To the extent that the Warden can keep the number of "down" cells to a minimum, he may house up to an additional 20 inmates in the Jail if habitable operational cells are available.

We believe that these allowances will not seriously impair the functioning of the jail since the additional inmates will be spread throughout the institution. However, to insure that there will be no strain, these additional inmates will be permitted *only* if (1) the position of Population Control Officer at the jail is filled and (2) the Jail remains in substantial compliance with the prior orders of this Court relative to conditions.

Because the defendants have repeatedly violated earlier Orders of this Court relative to population and medical care without seeking permission of the Court, we believe that financial sanctions are warranted and will grant the plaintiffs' petition in part.

The defendants will be fined $25,000 for failure to comply with this Court's orders.

The same fine will be imposed for each month in the future that applicable limits are exceeded. These fines will be payable immediately upon a violation of this Court's orders relative to the population count.

An appropriate Order will issue.

## ORDER

AND NOW, to-wit, this 17th day of November, 1988, for the reasons stated in the foregoing Opinion, it is ORDERED, ADJUDGED, and DECREED that:

1. no inmates shall be housed in the main facility of the Allegheny County Jail after June 30, 1990;

2. on or before May 1, 1989, the County shall submit to the Court a plan for construction of a new facility or alternative housing, accommodating at least 900 inmates, not counting the 435 inmates housed in the Jail Annex.

3. the County's Motion to Increase Population Cap be and hereby is conditionally GRANTED. The County may house inmates in the 20 utility room areas in the Jail if, in the opinion of the Court Monitor, these are converted to habitable cells. The County may further house up to an additional 20 inmates in the Jail to the extent that the Warden can keep the number of inoperable cells to a minimum. Said population increases may be made *only* if (1) the position of Population Control Officer at the Jail is filled, and (2) in the opinion of the Court Monitor the Jail remains in substantial compliance with the prior Orders of this Court relative to conditions.

4. plaintiffs' Motion for Sanctions be and hereby is GRANTED. The County is Ordered to pay a fine in the amount of $25,000 to the Clerk of Court on or before Friday, December 2, 1988;

5. third-party Defendant's Motion to Dismiss be and hereby is DENIED.