INMATES OF the ALLEGHENY COUNTY JAIL, Thomas Price Bey, Arthur Goslee, Robert Maloney, and Calvin Milligan on Their Own Behalf and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

Cyril H. WECHT, President of the Allegheny County Board of Prison Inspectors and the other members of the Board, Thomas Foerster and William H. Hunt, Commissioners for Allegheny County, Frank J. Lucchino, Controller for Allegheny County, Eugene Coon, Sheriff for Allegheny County, the Honorable Patrick R. Tamilia, Michael J. O'Malley and Marion K. Finkelhor, Judges Court of Common Pleas of Allegheny County, Richard S. Caliguiri, Mayor of the City of Pittsburgh, Harriet McCray, Monsg. Charles Owen Rice and Charles Kozakiewicz, Warden of the Allegheny County Jail, and William B. Robinson, Executive Director of Prison Inspectors, and Cyril Wecht, Thomas Foerster and William H. Hunt, as Commissioners of Allegheny County, Defendants,

v.

COMMONWEALTH OF PENNSYLVANIA, Third–Party Defendant.

Civ. A. No. 76–743.

United States District Court, W.D. Pennsylvania.

June 26, 1992.

Peter G. Nychis, Asst. Allegheny County Sol., Pittsburgh, Pa., for county defendants.

Donald Driscoll, Neighborhood Legal Services Assn., Pittsburgh, Pa., for plaintiffs inmates.

Thomas F. Halloran, Office of Atty. Gen., Western Regional Office, Pittsburgh, Pa., for third-party defendant Comm. of Pa.

Lynette Norton, Picadio McCall Kane & Norton, Pittsburgh, Pa., for Jail Monitor.

OPINION

COHILL, Chief Judge.

## Introduction

Presently before us are a number of motions filed on behalf of the defendants, whom we shall refer to as the "County" or "Allegheny County," and also motions by the plaintiff class of inmates, "the inmates."

(1) Motion to extend the time for closing the old jail and extending the time for completing the new one filed by the County;

(2) Motion to Increase the Court Ordered Jail Population Limit filed by the County;

(3) Motion to Dismiss Motion to Increase the Population Limit filed by the inmates;

(4) Motion to Modify and/or Clarify Order of Court Dated July 7, 1989 (sometimes referred to as the "Consent Decree" or "Stipulation") filed by the County; and

(5) Motion for Sanctions and/or Additional Relief filed by the inmates.

For the reasons set forth below, we will grant motions one, two and four and deny three and five.

This case has a long and tortured history dating back to 1976.[1]

The motions here relate to three basic issues: (i) whether the time to construct the new jail should be extended; (ii) whether the population cap established by this Court at the old main jail facility should be increased pending completion of the new jail; and (iii) whether the consent decree dated July 7, 1989 in which the County had agreed to establish a treatment/work release facility for the mentally ill should be modified.

Following a hearing conducted on May 1, 21, 27, and 28, 1992, we make the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

FINDINGS OF FACT

### A. *Deadline for Closing of the Jail*

The parties entered into a Stipulation dated July 7, 1989, which was approved by this Court. Item 11 of the Stipulation provides in relevant part:

The Plaintiffs hereby agree that the Old Allegheny County Jail facility must be kept open pending either its renovation or its replacement by a new facility until June 30, 1992. The Defendants shall advise the Court no later than October 1, 1989 as to whether they will renovate or close the jail.... If, in the opinion of the Court, the County is making reasonably prompt progress in implementing all of its plans for housing inmates, the Court will favorably consider requests for reasonable extensions of time for said renovations or construction.

Winston Churchill is credited with saying, "Americans can always be counted on to do the right thing—after all other options have been exhausted." That seems to have more or less been the case here.

Nevertheless, the "right thing" is finally being done by Allegheny County. The Court is aware that the County has undertaken the construction of a $147 million dollar Criminal Justice Complex which will house up to 2,400 prisoners. It is obvious that the project will not be completed by June 30, 1992. The County has informed the Court that the inmates should be residing in the new facility by November of 1994.

The inmates apparently recognize that we cannot simply close the ACJ. They request, however, that if we grant the extension, we should order the County (1) to fully and adequately explain why additional time is needed, (2) to develop additional community release beds to relieve the pressure of overcrowding, particularly as to the special populations in the old jail, and (3) to employ someone to assess independently

---

**1.** *Inmates of the Allegheny County Jail v. Wecht,* 699 F.Supp. 1137 (W.D.Pa.1988); 612 F.Supp. 874 (W.D.Pa.1985); 573 F.Supp. 454 (W.D.Pa. 1983); 565 F.Supp. 1278 (W.D.Pa.1983); *Inmates of the Allegheny County Jail v. Peirce,* 487

F.Supp. 638 (W.D.Pa.1980); *Owens–El v. Robinson,* 457 F.Supp. 984 (W.D.Pa.1978); 442 F.Supp. 1368 (W.D.Pa.1978). The foregoing are only the published opinions; we have also written many unpublished orders and memoranda.

the fire safety and staffing at the Jail, and follow that individual's recommendations.

As to item (1), we believe that the 18 monthly progress reports that the County has submitted since August 29, 1990 have fully apprised the inmates on the progress that is being made on the new jail. The inmates' attorney receives a copy of these reports. Therefore, we will deny this request.

■ In item (2), the inmates ask that we order the County to develop additional community release beds to alleviate the overcrowding at the ACJ. We decline to order them to do this. In the progress report dated June 1, 1992, Robert Coll, Director of the Criminal Justice Division, stated that the County will maintain its work-release programs and housing contracts, and will expand when necessary. Such determinations must be left in the hands of those county officials absent special circumstances which we feel no longer exist here. *See Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, ——, 112 S.Ct. 748, 764, 116 L.Ed.2d 867, 891 (1992). We also note that the County has developed 179 beds at the Public Safety Building since the Consent Decree and has contracted for over 300 other placements beyond the Main Jail and Annex, in various locations including work-release centers, rehabilitation programs, and other county jails. Jail Monitor's Exhibit 2 (5–21–92).

Finally, in item (3), the inmates request that we order the County to employ an independent expert on fire safety and staffing. While we believe that the inmates' suggestion may have some merit with respect to staffing, we will not order the County to undertake such an evaluation because we are more than satisfied with our Jail Monitor, Lynette Norton, Esq. If she feels that there should be an outside advisor, we will count on her to notify the Court.

In sum, we commend the County on the progress that it has recently made in this case and in bringing this matter closer to a final conclusion. Therefore, we will grant the County's motion, and extend the closing date of the Jail to December 1, 1994.

## B. *Population Cap Issue*

On April 21, 1989, this Court permitted an increase in the population cap at the Allegheny County Jail from 540 to the present figure of 578. When we refer to the "Jail" or the "ACJ," we are only discussing the old main jail facility. That increase was made pursuant to an Opinion and Order dated November 17, 1988. *Inmates of Allegheny County Jail v. Wecht,* 699 F.Supp. 1137 (W.D.Pa.1988). In that opinion, we stated:

> The County may house inmates in the 20 utility room areas in the Jail if, in the opinion of the Court Monitor, these are converted to habitable cells. The County may further house up to an additional 20 inmates in the Jail to the extent that the Warden can keep the number of inoperable cells to a minimum.

*Id.,* 699 F.Supp. at 1148. Before permitting any increase in the population, we required (1) that the County fill the position of Population Control Officer at the Jail, and (2) that the Jail remain in substantial compliance with the prior court orders relating to conditions at the ACJ. *Id.* These conditions were fulfilled, and in April of 1989, we increased the population cap by 18 to its present figure of 578.

In her report on population at the Allegheny County Jail for February 1992, the Jail Monitor set out the following chart which demonstrates how many cells are located in each of the various housing units at the Jail:

| Area | Cells |
|---|---|
| North Block | 47 |
| East Block | 249 |
| West Block | 209 |
| Mental Health Unit I | 20 |
| Mental Health Unit II | 20 |
| Receiving Unit | 63 |
| Disciplinary Housing Unit | 24 |
| Total | 632 |

Ms. Norton reported that as a result of improved maintenance, the number of "down cells"—cells that are inoperable and unavailable for inmate housing—has been substantially reduced, thus increasing the potential housing capacity in the Jail.

Throughout January and February of 1992, the maximum number of cells down at any one time was eight. Thus, 624 cells are potentially available if the County can limit the down cells to eight.

As a part of her duties, the Jail Monitor files reports with the Court every month and visits the Jail approximately once a month. During her visits, she talks with the inmates and has uncovered two primary complaints: one, the cells are small and cramped, and two, the heating of the facility is not consistent. Some inmates also informed Ms. Norton that it takes too long before they can see a counsellor. Overall, Ms. Norton felt that the inmates believed that things are about as good as they can be under the circumstances.

The Jail Monitor testified that on the date of her testimony (May 21, 1992), only six cells were down, and the last time she had been at the ACJ, work was being done on them. She also testified that food service and sanitation are "pretty good." As to the computerized fire alarm system installed by order of this Court, originally, the heat from the steam of the showers had set off the alarm, and there were problems, but adjustments have been made, and Ms. Norton concluded that the computerized system is working "much better."

Ms. Norton opined that the ACJ could adequately function with an increase in the number of inmates, basically because it is usually functioning with a number that exceeds the cap anyway. We had previously set out a schedule of fines when the County violated the Court order by failing to release enough inmates to comply with the cap. We also fined the County for each inmate released in order to spur the County to increase its jail population capacity by construction of new jail facilities or alternative facilities. Population reports that were introduced at trial showed that from December 16, 1991 through March 31, 1992, the Jail was operating in violation of the Court order with an inmate population of 632 or more on 70 of 105 days. County's Exhibits 9–16 (5–1–92).

Deputy Warden James Gregg agreed that there were a total of 632 available cells. He reported that the present number of down cells is six, and that they were being worked on the day of the hearing. Mr. Gregg testified that a population of 632 at the Jail would not affect evacuation procedures in the event of an emergency, because there have been two prior successful evacuations at the ACJ. Additionally, he said that sufficient services would be available for such a population including security, food, health care, and sanitation.

As to the fire alarm system, Mr. Gregg explained that there are actually two fire alarm systems. One is the pull-box system which is linked directly to the fire department, and the other is the computerized alarm system with smoke and heat sensors. Mr. Gregg also admitted that the steam heat from the showers and laundry set off the computerized system when it was first installed, but that heat detectors were replaced to correct this. Additionally, even if the computerized system is down, the pull boxes located throughout the Jail can be used to directly notify the fire department.

He also stated that the present staff, including the four counsellors at the Jail, is sufficient to handle an increased population. A fifth counsellor position is about to be filled. Furthermore, he stated that the Jail's climate is comfortable, and he has not received any complaints from the inmates.

We had been concerned about reports that the gymnasium was being used to house inmates. Mr. Gregg testified that the gymnasium at the ACJ is used to receive inmates in emergencies when the original receiving unit is full. When such an event occurs, strict guidelines are followed. County's Exhibits 6, 7 (5–1–92). Mr. Gregg further stated that no incidents were reported while the gym was so used. The last date when the gym had to be used in this manner was on March 31, 1992, when ten inmates were housed there. County's Exhibit 67 (5–1–92).

Federal Deputy Marshal George Britton, who conducts inspections of jails that house federal prisoners, testified that the ACJ is adequate for the needs of the U.S. Marshal's Service. Most federal prisoners who would be housed in the ACJ are there

for a relatively short period of time, usually only for the period of their own trial or for a day or so when testifying as a witness.[2]

The County now asks the Court to increase the population cap at the main jail to 632.

The inmates object to this request for two primary reasons. First, they argue that there has not been any significant improvement in the number of "down cells" since our November 17, 1988 Opinion and Order. Second, there has not been any change in the oppressive conditions at the Jail, such as the lack of adequate living space and space for exercise and recreation, adequate physical and mental health care, and adequate smoke detection and sprinkler systems.

## C. *Mental Health Issue*

As previously noted, on July 7, 1989, the parties entered into a Stipulation, which was approved by this Court. Item 7 of the Stipulation provides:

The Defendants commit themselves to the development of a treatment/work release facility for the mentally ill comparable to the presently planned drug treatment facility. . . .

The County urges us to modify and/or clarify the court order approving the stipulation and allow it to proceed with the implementation of an Intensive Case Management (ICM) Plan.

The inmates respond that pursuant to the stipulation, the County must establish a single facility which would house up to 50 forensic individuals who are mentally retarded or mentally ill.

Charles Peters, the Director of the Allegheny County Mental Health/Mental Retardation Program (MH/MR) testified that establishment of a "facility" or a mini institution for the mentally ill is not in the best interest of the public or the mentally ill.

The solution, according to Mr. Peters, is the establishment of an ICM program.

The proposal for the ICM program is set out in the County's Exhibit 64 (5–1–92). Mr. Peters described the program at the hearing. The program would consist of five case managers, who would each have a caseload of 20–30 clients. The case managers' role is to link the clients with services, not deliver services. The services would be provided by institutions such as Western Psychiatric Institute, St. Francis Hospital, Community Human Services, and Mon–Yough/Ielease Institute. Mr. Peters concluded that he is "very confident" that an ICM program would work in Allegheny County.

In opposition, the inmates called Robert E. Huber, the Executive Director of Stairways, in Erie, Pennsylvania, and Billie Lyle, the Residential Program Manager at Stairways. Stairways is a residential treatment facility. Mr. Huber admitted that the ICM program is important, but supports the forensic program in place at Stairways.

Ms. Lyle explained the Stairways program. It is a 24 hour full care residential program which will admit persons who are charged with crimes that are not serious. Jail personnel occasionally refer persons to the program, and Stairways then conducts a risk evaluation of the person to determine whether they can accept that person into their program. The risk evaluation includes considering whether the crime was serious, whether the crime was committed recently, and whether the crime reflected a pattern of behavior.

The testimony about Stairways was not particularly helpful. They service a very limited number of forensic residents (eight at the time of the hearing); they have never had a pretrial detainee in the program and only a few convicted inmates.

The inmates also called Joel Dvoskin, Ph.D., the Associate Commissioner of Forensic Services of New York. He testified

---

**2.** In July of 1984 the County had entered into an Intergovernmental Cooperative Agreement with the U.S. Marshal's Service in which it agreed to provide detention space for 30 federal prisoners each day. Robert Coll, the Criminal Justice Division Director, testified that the agreement was suspended after the Court imposed the population cap because there was not even enough room for County inmates.

by way of a video taped deposition. Dr. Dvoskin, a proponent of individualized treatment, stated that the ICM program is successful in New York. Although it is a "tremendous idea," one drawback is finding a residence for someone who is in jail. Dr. Dvoskin felt that this is a major problem with the ICM program. His program is state-wide and underwritten by the state.

Richard Asarian, Ph.D., a co-founder of the Ielease Institute, which is under contract with the County, testified on behalf of the inmates. Dr. Asarian stated that he is opposed to institutionalization for treating the mentally ill. Dr. Asarian explained that a lengthy stay in an institution has a detrimental effect on the mentally ill individual. He believes that there should be a continuity in treatment of the mentally ill, so that the therapist has an opportunity to "bond" with the person. He opined that the ICM concept is "excellent" because the same person is involved in the treatment of the individual.

The inmates also called Howard P. Friday, M.D. the Director of the Forensic Center at Mayview State Hospital. Dr. Friday opined that certain mentally ill individuals would benefit from a structured residential facility.

## CONCLUSIONS OF LAW

### A. *Population Cap Issue*

The inmates contend that the jail is presently too crowded to permit an increase in the population cap. In *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court of the United States, in considering double celling of inmates, held that double celling at the Southern Ohio Correctional Facility did not constitute cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendment. The court stated that "[t]he double celling made necessary by the unanticipated increase in prison population did not lead to deprivations of essential food, medical care, or sanitation. Nor did it increase violence among inmates or create other conditions intolerable for prison confinement." *Id.,* 452 U.S. at 348, 101 S.Ct. at 2400. Thus, double celling is not unconstitutional *per se.* One must look at all aspects of the jail in question.

Following the standard set out by *Rhodes v. Chapman,* to determine whether an increase in the population cap at the ACJ would violate the Eighth and Fourteenth Amendments, we must look to such factors as adequacy of food service, medical care, sanitation, and safety of the inmates.

Both the Jail Monitor and Deputy Warden Gregg opined that the Jail can handle an increased population. In fact, as previously noted, from December 16, 1991 through March 31, 1992, the Jail operated with an inmate population of 632 or more on 70 days. Both Ms. Norton and Mr. Gregg testified that food service and sanitation have not been affected by the increase in population. Further, evacuation procedures would not be hampered. According to Mr. Gregg, the staff, including the counsellors, is sufficient to handle an increase, along with the new fifth counsellor.

We therefore conclude that increasing the population cap at the Jail will not deprive the inmates of adequate sanitation, safety, inmate needs and services, and staffing. *See Rhodes v. Chapman,* 452 U.S. at 364, 101 S.Ct. at 2408. We hasten to add however, that this permission is contingent on the County maintaining its present level of staffing, and we will not hesitate to order a hearing to consider an increase in staffing if the Jail Monitor or the inmates request it. In addition, the fifth counsellor must be in place before the increase may go into effect.

As to the inmates' contention that there has not been any significant improvement in the number of down cells since November of 1988, in that opinion we stated that "[o]n any given day, approximately 20 cells are 'down'...." 699 F.Supp. at 1140. At the recent hearing, however, both the Jail Monitor and Mr. Gregg testified that the average number of down cells in the first part of 1992 was eight. During the hearing, both reported that the number of down cells that day was six, and those cells were

being worked on.[3] Therefore, contrary to plaintiffs' assertion, there has been a significant decrease in the number of down cells.

As to the inmates' contention that the conditions at the jail are oppressive, they primarily focus on the absence of adequate space for physical and mental health care, the lack of adequate living space in the cells and otherwise, and the lack of adequate space for inmate exercise and recreation. We cannot disagree that space is limited at the Jail. This is why a new jail is being built.

The inmates also complain about the faults of the fire alarm system. Ms. Norton and Mr. Gregg stated that although the computerized fire alarm system is not perfect, it is working much better than when it was installed. Further, the pull box alarm system, which is directly linked to the fire station, functions properly. Additionally, Mr. Gregg testified that there are fire extinguishers placed throughout the Jail, which are checked regularly. Evacuation procedures are also apparently well organized, since there have been two successful evacuations.

We will, therefore, permit an increase in the population cap. We will, however, leave a cushion of 10 for cells which may become inoperable. Thus, we will increase the population cap at the Jail to 622, contingent as we said, on present staffing being maintained, or increased if this is later determined by the Court to be necessary, and the addition of the fifth counsellor. This will become effective July 1, 1992, assuming the fifth counsellor's position is filled, otherwise, at such time as that position is filled.

### B. *Mental Health Issue*

■ As we pointed out in our opinion of November 17, 1988, "[w]hen this case was filed in 1976, the litigation focused on conditions at the Jail. Overcrowding was not a problem until 1983." 699 F.Supp. at 1140. Various issues relating to overcrowding have come before the Court since then. Today, however, the parties ask us

to determine which program would best suit the needs of the forensic mentally ill, a function ill-suited for determination by the courts. The stipulation called for construction of a mental health facility. The issue now is whether the consent decree entered into on July 7, 1989 should be modified.

We acknowledge that at the same time the defendant's proposed plans and programs have been changing, the law applicable to these kinds of cases has been evolving.

In *Rufo v. Inmates of Suffolk County Jail,* — U.S. —, —, 112 S.Ct. 748, 764–65, 116 L.Ed.2d 867, 892 (1992), the Supreme Court held that the "grievous wrong" standard established by *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932) does not apply to requests to modify consent decrees stemming from institutional reform litigation. The Supreme Court, instead, adopted a flexible standard where a party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstances. *Rufo,* — U.S. at —, 112 S.Ct. at 764–65, 116 L.Ed.2d at 892. While certainly no consent decree should be modified without serious study, the law would be grievously inflexible if it could not be modified when conditions change.

The County asserts that there has been a significant change in conditions which warrants revision of the consent decree. Mr. Peters, who has been the Director of the Allegheny County MH/MR Program for 17 years, testified that professionals in the mental health/mental retardation area have moved away from the belief that institutionalization is always best for the care of the mentally ill. In fact, Dr. Asarian testified that he was opposed to *any* institutional treatment of the mentally ill. Instead, the popular philosophy now is that the mentally ill do better in noninstitutional settings. The County's proposed ICM program, according to Mr. Peters, comports

---

**3.** In Ms. Norton's most recent report (June 24th, 1992) she reported only two down cells.

with this new philosophy and thus, is in the best interest of the public and the mentally ill.

Dr. Dvoskin and Dr. Asarian both testified that the ICM program is an excellent idea. Further, even Mr. Huber, the Executive Director of the Stairways Program in Erie, stated that the ICM program is an important concept.

We believe that the deinstitutionalization philosophy in the mental health field constitutes a significant change in treatment prescribed for the mentally ill, and therefore, we must consider whether the County's proposed ICM program is suitably tailored to comport with this new theory.

In *Rufo,* the Supreme Court warned that a modification of a consent decree should neither create or perpetuate a constitutional violation nor conform to the constitutional minimum. *Rufo,* —— U.S. at ——, 112 S.Ct. at 763–64, 116 L.Ed.2d at 890–91. In this case, the inmates do not allege that the ICM program is unconstitutional. Further, they do not allege that the ICM program simply meets the constitutional minimum. Their argument is, instead, that since the County had agreed to the establishment of a single facility, they should stick to it. This argument is without merit under *Rufo.*

### C. *Sanctions*

The inmates seek to have the Court impose sanctions on the County for being dilatory. While we have often criticized the County on this point, we believe that the County has now turned the corner and is progressing as well as could be expected given the complexities of acquiring and cleaning up construction sites, and undertaking a major construction project. We see no purpose to be served by imposing sanctions and will not do so.

### CONCLUSION

From the outset of this case, sixteen years ago, we have consistently reiterated that this Court has no desire to micromanage the operation of the Allegheny County Jail. We have attempted to set out constitutional parameters and relied on the Coun-

ty Commissioners and their appointed representatives to see that they conform.

Once again, we will defer to the Allegheny County officials who have primary responsibility for evaluating, assessing, and solving the problems of institutional reform. *See Rufo,* —— U.S. at ——, 112 S.Ct. at 764, 116 L.Ed.2d at 891. We conclude that the County's proposed ICM program is suitably tailored to comport with the current philosophy in the case of the mentally ill. Therefore, we will modify the consent decree entered into on July 7, 1989 and allow the County to implement its proposed ICM plan.

Further, in County's Exhibit 64 (5–1–92), the ICM proposal, the County requests that the monies that have been collected by the Clerk of Court as fines in this case be used to establish a contingency fund to be used by the Intensive Case Management Team.

We believe that now that the entire jail problem is progressing toward resolution, it would not be inappropriate to permit the County to use some of the money from the fines collected in this case, to implement the ICM program.

We will permit the fine money to be so used, but not until the County officials and the Jail Monitor work out a system wherein she can monitor requests and the manner in which the money is thereafter expended. We suggest, but will not require, that the parties meet to discuss these plans since the inmates' representatives obviously have developed many good resources for mental health treatment and advice. We will require that the County submit such a plan to the Court for approval before any monies are disbursed.

This Court expects the County to comply with the new cap and we may not excuse future repetitive non-compliance. Therefore, the order imposing fines shall remain in full force and effect, except to the extent that it is affected by the increase in the population cap.

An appropriate order will issue.

### ORDER

AND NOW, to-wit, this 26th day of June, 1992, it is ORDERED, ADJUDGED, and DECREED that:

1. The County's Motion to Extend the Time for the Closing of the Old Jail and Opening of the New Jail be and hereby is GRANTED. The County shall have until December 1, 1994 to have the new jail in full operation;

2. The Motion to Increase the Court Ordered Jail Population Limit from 578 to 632 filed by defendant Allegheny County (the County) be and hereby is GRANTED in part, and the population cap is now set at 622, effective July 1, 1992, contingent upon the County maintaining staffing at present levels or increasing staffing if deemed necessary by the Court, and upon the addition of a fifth counsellor prior to the population cap increase going into effect;

3. The Motion by plaintiff inmates of the Allegheny County Jail to Dismiss the County's Motion to Increase the Population Limit filed be and hereby is DENIED;

4. The Motion to Modify and/or Clarify Order of Court Dated July 7, 1989 filed by the County be and hereby is GRANTED. The County may implement its proposed Intensive Case Management (ICM) plan. It is further ORDERED that the County may use the monies collected by the Clerk of Court as fines in this case to be used for the establishment of the ICM program. A plan for such disbursements must first be submitted to the Court for approval, and thereafter all expenditures must be approved by the Jail Monitor;

5. The Motion for Sanctions and/or Additional Relief filed by the inmates be and hereby is DENIED.