

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-22-1996

# Inmates Allegheny v. Wecht

Precedential or Non-Precedential:

Docket 95-3402

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"Inmates Allegheny v. Wecht" (1996). *1996 Decisions.* Paper 90.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/90

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

INMATES OF THE ALLEGHENY COUNTY JAIL, THOMAS PRICE BEY, ARTHUR
GOSLEE, ROBERT MALONEY, and CALVIN MILLIGAN on their own behalf
and on behalf of all others similarly situated,

Appellants

v.

CYRIL H. WECHT, President of the Allegheny County Board of Prison
Inspectors, and the other members of the Board; THOMAS FOERSTER
and WILLIAM H. HUNT, Commissioners for Allegheny County; FRANK J.
LUCCHINO, Controller for Allegheny County; EUGENE COON, Sheriff
for Allegheny County; THE HONORABLE PATRICK R. TAMILIA; MICHAEL
 J. O'MALLEY and MARION K. FINKELHOR, JUDGES, Court of Common
 Pleas of Allegheny County; RICHARD S. CALIGUIRI, Mayor of the
City of Pittsburgh, HARRIET MCCRAY; MSGR. CHARLES OWEN RICE; and
  CHARLES KOZAKIEWICZ, Warden of the Allegheny County Jail and
WILLIAM R. ROBINSON, Executive Director of Prison Inspectors; and
      CYRIL WECHT, THOMAS FOERSTER and WILLIAM H. HUNT, as
              Commissioners of Allegheny County,

v.

   THE COMMONWEALTH OF PENNSYLVANIA; THE COMMONWEALTH OF
 PENNSYLVANIA, DEPARTMENT OF CORRECTIONS:  DAVIS S. OWENS, JR.,
 Commissioner, Department of Corrections; and ERSKIND DERAMUS,
       Deputy Commissioner, Department of Corrections

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania

D.C. No. 76-00743

_____

Argued March 22, 1996

Before:  BECKER and McKEE, Circuit Judges,
and POLLAK, District Judge

(Filed August 22, 1996)

Donald Driscoll (argued)
Neighborhood Legal Services Association
928 Penn Avenue

Pittsburgh, PA 15222-3799
    Attorney for Appellant

Dennis R. Biondo (argued)
Timothy W. Pawol
Peter G. Nychis
Office of Allegheny County
    Law Department
445 Fort Pitt Boulevard
300 Fort Pitt Commons Building
Pittsburgh, PA 15219
    Attorneys for Appellees

———————————

OPINION OF THE COURT
———————————

POLLAK, District Judge.
         In this long-running litigation   aspects of which have
been before this court before   appellants, a class consisting
of all past, present, and future inmates of the Allegheny County
Jail, appeal from an order entered by the district court on May
26, 1995, which, after argument but without an evidentiary
hearing, approved a modification of a portion of a consent decree
entered in July 1989.  Under the terms of the 1989 consent
decree, appellees   Allegheny County, officials of Allegheny
County, and officials of the Allegheny County Jail, all of whom
we will refer to collectively as "the County"   were required to
establish a facility to provide services to mentally ill inmates.
The May 26, 1995 order vacated this directive, replacing it with
a requirement that the County provide services to mentally ill
inmates through community-based mental health programs.  Under
the terms of the May 26, 1995 order, only inmates who meet
certain eligibility criteria could participate in the community-
based programs.  An inmate with a "past history of violence" or
who faces charges more serious than a "minor, non-violent crime"
would be ineligible for admission to any of these community-based
mental health programs.  Appellants assert that this limitation
violates the Rehabilitation Act of 1973 and the Americans with
Disabilities Act of 1990.  We find that resolving this question
requires ascertaining certain facts, and we therefore vacate the
May 26, 1995 order and remand for factfinding.

I.
         The Allegheny County Jail holds both convicted
criminals and pretrial detainees.  In 1976, inmates of the jail
filed this class action litigation, asserting, under 42 U.S.C. §
1983, that the conditions of confinement did not satisfy minimum
constitutional requirements.  In two opinions issued in 1978, the
district court found that conditions at the jail were shockingly
substandard in a wide variety of ways.  Owens-El v. Robinson, 442
F. Supp. 1368 (W.D. Pa. 1978); Owens-El v. Robinson, 457 F. Supp.
984 (W.D. Pa. 1978).  As this court later summarized certain of

the district court's general findings:

> Living facilities were unhealthy and unsafe. The plumbing system was antiquated and in disrepair. As a result, leaks and overflows frequently occurred in the cells. The cells lacked adequate lighting; the efforts of inmate-electricians seeking to remedy that defect caused exposed electrical wires which presented fire and shock hazards. Prisoners were required to sleep on canvas cots, many of which were discolored by blood, vomit, feces, and urine. Vermin abounded. Cell temperatures fluctuated between extreme cold in the winter and extreme heat in the summer. The shortage of guards reduced supervision of the inmates and permitted hoarding and vandalism of necessary supplies. This in turn contributed significantly to chronic shortages of necessary items such as blankets and bath towels.
>
> . . .
>
> Some inmates were placed in solitary confinement for up to fourteen days without a mattress, toilet articles, or a change of clothing. Other inmates were confined in the nude in the isolation cell, an unfurnished, darkened, windowless room for up to fourteen consecutive hours, without any blanket or sheets.

Inmates of the Allegheny County Jail v. Pierce, 612 F.2d 754, 757 (3d Cir. 1979).

The district court addressed in some detail the treatment accorded inmates who displayed mental disorders. The court noted that no psychiatrists or psychologists served on the jail staff. Further, the court described the "restraint room" in which were housed inmates who acted out, or who suffered from withdrawal, delirium tremens, epileptic seizures, or other mental conditions:

> In this bleak room the inmates are placed in a hospital gown or naked on a canvas cot with a hole cut in the middle. Their body wastes drop through the hole into a tub on the floor underneath the cot. The tub is emptied twice a day. These inmates are shackled by leather restraints to the canvas cots. Physical restraints may be either full, where the inmate's wrists and ankles are bound by the manacles to the cot, or partial, where only one or both ankles are manacled. The medical logs, introduced into evidence, revealed that inmates have been

> held in such restraints for as long as
> twenty-nine days.

Owens-El, 442 F. Supp. at 1380.  The court decided, however, that addressing the treatment of mentally ill inmates would "go[] beyond the parameters of the case."  Id. at 1382.

We reversed this latter ruling and concluded that the district court had authority to address the mental health conditions at the jail.  Inmates of the Allegheny County Jail v. Peirce, 612 F.2d 754, 763 (3d Cir. 1979).  On remand, the district court held that the lack of services for mentally ill inmates violated the Constitution.  The court found that "a significant proportion, perhaps as many as a quarter to a third," of the inmates at the jail could be considered seriously mentally ill.  Inmates of the Allegheny County Jail v. Peirce, 487 F. Supp. 638, 641 (W.D. Pa. 1980).  And the court further found that, notwithstanding the high proportion of mentally ill inmates, there was

> no system for care of mentally ill inmates in
> the jail and . . . the haphazard and
> inconsistent care and protection now being
> afforded is far below minimum standards.  The
> deficiencies in immediate care result in
> physical danger to the ill inmates and to
> others, create security problems in the jail,
> aggravate  rather than alleviate  the
> conditions of many of the most seriously ill,
> and contribute to the chaotic environment in
> the jail.

Id. at 643.  Accordingly, the court ordered the County (1) to create a separate mental health unit within the jail to house mentally ill inmates; (2) to establish a program for screening all incoming inmates for mental illness; (3) to hire an administrator to implement mental illness programs; and (4) to hire two psychiatrists and additional nurses.  The court further ordered that the mental health unit be staffed with at least one guard and one nurse per shift, and that civil commitment proceedings should commence within 72 hours of a determination that an inmate should be transferred to a mental health institution.

In 1988, the district court, in the face of dramatic overcrowding in the jail and continuing constitutional violations, ordered that the jail be closed.  Inmates of the Allegheny County Jail v. Wecht, 699 F. Supp. 1137 (W.D. Pa. 1988).  The court concluded that the 102-year old facility "cannot handle the demands required of a modern jail facility." Id. at 1146.  Among the most grievous problems caused by overcrowding was the lack of space for adequate mental health care.  The forty beds in the new mental health unit were regularly filled, and, as a result, mentally ill inmates were often housed among the general inmate population, causing disruptions among both groups.

We affirmed the district court's order closing the

jail. Inmates of the Allegheny County Jail v. Wecht, 874 F.2d 147, 155 (3d Cir. 1989).

On July 7, 1989, subsequent to the affirmance of the jail-closing order, the parties to this litigation entered into a consent decree to remedy the many constitutional violations that had been found. Paragraph 7 of the consent decree addressed the provision of services for mentally ill inmates as follows:

> The Defendants commit themselves to the development of a treatment/work release facility for the mentally ill comparable to the presently planned drug treatment facility as set forth in Defendant's Exhibit 3, admitted at the June 12, 1989 court hearing. A specific plan for this project and a progress report on its implementation shall be included in the monthly progress reports required by the Court's Order of May 12, 1989.

Consent Decree ¶ 7, entered July 7, 1989. Under this provision, the County became obligated to establish a single, institutional facility for handling mentally ill inmates.

Three years later, the County sought a modification of the consent decree. Rather than create a separate facility for mentally ill inmates, the County sought to implement a plan under which mentally ill inmates would receive treatment in community-based mental health programs. Under the County's plan, case managers would link mentally ill inmates with services provided within the community. Applying Rufo v. Inmates of Suffolk County Jail, 112 S. Ct. 748 (1992)  in which the Supreme Court established a standard for assessing proposed modifications of consent decrees  the district court granted the County's requested modification. Inmates of the Allegheny County Jail v. Wecht, 797 F. Supp. 428, 434-35 (W.D. Pa. 1992). Under Rufo, the party seeking modification must, among other things, "establish[] that a significant change in circumstances warrants revision of the decree." 112 S. Ct. at 760. The district court concluded that mental health philosophy had shifted from an emphasis on institutionalized care to a belief in the efficacy of treatment in non-institutional settings, and that this change in philosophy constituted a change in circumstances sufficient to satisfy Rufo.

We reversed, concluding that the change in mental health philosophy predated the 1989 consent decree and therefore did not justify the modification. Inmates of Allegheny County v. Wecht, No. 92-3434 (3d Cir. May 20, 1993). We noted, however, that both the inmates and the County no longer viewed the terms of the 1989 consent decree as the optimal remedy and that both parties supported community-based treatment. While the County viewed community-based services alone as the best approach, the inmates wanted such services to be supplemented by decentralized "structured residential" settings for those inmates who could not be accommodated through community-based programs. We remanded in order to allow the district court to make factual findings as to whether some other change of circumstance  e.g., an increased

availability of community-based programs subsequent to 1989 might justify a modification of the consent decree.

In 1995, the County and the inmates undertook to negotiate a modification of the 1989 consent decree. Under the proposed modification, Paragraph 7 of the 1989 consent decree, mandating the creation of a separate facility for the mentally ill, was to be eliminated. In its place, the parties agreed to the creation of a Forensic Support Program, under which the County would provide community-based mental health services to a maximum of twenty-five inmates. The agreement contemplated that the Forensic Support Program would utilize the services of local hospitals, psychiatric institutions, and human service and release groups, and that judicial approval would be required before an inmate would be released into the program.

The County and the inmates recognized that not all mentally ill inmates would be appropriate candidates for treatment in the community-based Forensic Support Program. Based on this recognition, the parties developed eligibility criteria covering several categories of mentally ill inmates: The agreed eligibility criteria are as follows:

> [1] Persons must not pose an apparent risk of harm to themselves or others;
> [2] Persons must not be engaged in a calculated conspiracy;
> [3] Persons must not be charged with any sexual assault crimes, any crimes involving the victimization of minors, and crimes involving drug trafficking, including, but not limited to, the delivery or possession with the intent to deliver a controlled substance, or conspiracy to commit any of these crimes.
> [4] Persons must agree to comply with any conditions of release, if any, imposed by the holding authority, including participation in prescribed treatment.

Order of May 26, 1995 at ¶ 5. But the parties were not able to reach agreement on whether inmates who had a history of violence, or who were charged with violent crimes, should be categorically excluded from community-based programs or whether individualized assessments of such persons could adequately screen out those who posed a public safety risk. It is this disagreement that has precipitated this newest round of litigation.

In the district court, the County contended that an inmate "must be charged with a minor, non-violent crime and not have a past history of violence" in order to qualify for the community-based programs. Public safety, as well as public support for community-based programs, the County argued, require the exclusion from these programs of all inmates who may have had a history of violence. In contrast, the inmates contended that individual assessments of the threats posed by mentally ill inmates would adequately address the County's public safety concerns. On May 26, 1995, the district court approved the

County's proposed modification and, accordingly, directed that only an inmate "charged with a minor, non-violent crime" and who did not have a "past history of violence" could be included in the community-based programs.  The court's order contains no explication of the phrase "charged with a minor, non-violent crime" or the term "past history of violence."  Since the order was not accompanied by an opinion, or by findings of fact and conclusions of law, the precise scope of the quoted language is unclear.

After entry of the district court's order, the inmates moved for reconsideration or, alternatively, for findings of fact pursuant to Rule 52(b) of the Rules of Civil Procedure.  The motion was denied, and the inmates thereupon appealed from the district court's May 26, 1995 order modifying the consent decree.

## II.

We review a modification of a consent decree for abuse of discretion.  Delaware Valley Citizens' Council v. Commonwealth of Pennsylvania, 674 F.2d 976, 978 (3d Cir. 1982) ("Our scope of review on this appeal is narrow: whether, in its order modifying and refusing to modify the consent decree, the district court abused its discretion.").  See also Favia v. Indiana University of Pennsylvania, 7 F.3d 332, 340-42 (3d Cir. 1993).  Abuse of discretion can be found when a district court's decision is "arbitrary, capricious or irrational or employs improper standards, criteria or procedures," Favia, 7 F.3d at 340 (quoting Pennsylvania v. Local Union 542, 807 F.2d 330 (3d Cir. 1986)), such as when a district court does not "hold an evidentiary hearing before modifying a consent decree in such a manner as to remove requirements previously imposed."  Delaware Valley, 674 F.2d at 981.

Appellants argue that under the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990 (ADA) the County cannot categorically exclude from community-based mental health services all inmates who are charged with minor, non-violent crimes or who have past histories of violence.  According to the appellants, violent behavior is often a manifestation of mental illness.  Thus, the appellants argue, categorical exclusion on the basis of such behavior, whether actual or alleged, constitutes disability-based discrimination.  Acknowledging that persons who pose a threat to others are not "qualified" for community-based programs, the inmates assert that some mentally ill persons who have in the past committed acts of violence, or who are currently charged with violent crimes, do not pose a present threat to others, and that such persons are, indeed, "qualified" for community-based services.  Providing individualized assessments, the inmates contend, would reasonably accommodate the needs of this group of mentally ill persons without unduly burdening County resources.

In response, the County first argues that the Rehabilitation Act and the ADA do not apply to correctional facilities.  Second  assuming arguendo that these statutes do apply  the County maintains that differentiating among inmates

on the basis of their violent behavior does not amount to disability-based discrimination.  And even if exclusion of violent inmates from community-based mental health services is, in some cases, exclusion on the basis of disability, the County asserts that inmates who are charged with violent crimes or who have been violent in the past are categorically unqualified for community-based programs because they pose an unacceptable safety threat and because providing community-based services to potentially violent inmates would jeopardize public support for these services.  The County further argues that individualized assessments could not reliably screen out those inmates with a violent past who pose a present safety threat.  Moreover, the County argues, even if individual assessments could reliably identify those inmates who currently pose a safety threat, such individualized assessments would be a heavy drain on County resources and thus would not constitute a reasonable accommodation.

## A.

The first question to be addressed is whether the Rehabilitation Act and the ADA apply to correctional facilities.

The Rehabilitation Act and the ADA have a common substantive core  prohibiting broad arrays of institutions that serve the public from discriminating against disabled individuals on the basis of disability.  Section 504 of the Rehabilitation Act applies not only to any program conducted by an executive agency of the federal government but to "any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a); the term "program or activity" is defined as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b)(1)(A).  Title II of the ADA applies to the "services, programs, or activities" of any "public entity," 42 U.S.C. § 12132, without regard to whether such services, programs, or activities are federally funded; a "public entity" includes "any State or local government [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1).  Thus, as a matter of syntax, the two statutes cover all aspects of state and local governance.  Accordingly, if it be the case that when Congress writes a statute in plain words those plain words are to be the paramount guides utilized by the courts in construing the statute  see, e.g., United States v. Alvarez-Sanchez, 114 S. Ct. 1599, 1603 (1994) ("When interpreting a statute, we look first and foremost to its text."); Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992) ("In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished.")  it would seem to follow that both the ADA and the Rehabilitation Act apply to state and local correctional facilities.

Relying on the statute's plain language, the Ninth Circuit has held that the Rehabilitation Act protects state

prison inmates from disability-based discrimination in the administration of programs for inmates of correctional facilities. In Bonner v. Lewis, 857 F.2d 559 (9th Cir. 1988), a deaf inmate sued prison officials, asserting that the prison was obligated under the Rehabilitation Act to provide a qualified sign language interpreter in various prison settings, including counseling sessions and prison administrative hearings. Prison officials argued that the Rehabilitation Act did not protect inmates from disability discrimination because "inmates are hardly in need of help to live independently within their prisons." Id. at 562. The Ninth Circuit disagreed:

> First, . . . the plain language of the Justice Department's implementing regulations, 28 C.F.R. § 42.503, and the Act itself, which states that it applies to "anyprogram or activity receiving Federal financial assistance," 29 U.S.C. § 794 (emphasis added) belies [prison officials'] argument. Second, the Act's goals of independent living and vocational rehabilitation should in fact mirror the goals of prison officials as they attempt to rehabilitate prisoners and prepare them to lead productive lives once their sentences are complete. By ensuring that inmates have meaningful access to prison activities, such as disciplinary proceedings and counseling, the goals of both the institution and the Rehabilitation Act are served.

Id.

Notwithstanding the unambiguous language of the disability statutes, the Tenth Circuit has held that the Rehabilitation Act and the ADA do not apply to at least certain claims arising in the correctional context. The Tenth Circuit's starting point was Williams v. Meese, 926 F.2d 994, 997 (10th Cir. 1991). The court there held that the Rehabilitation Act does not apply to employment discrimination claims challenging certain aspects of programs involving the employment of federal prison inmates. The court stated, "The section of the Rehabilitation Act cited by the plaintiff [section 504], does not give plaintiff any substantive rights since the Federal Bureau of Prisons does not fit the definition of 'programs or activities' governed by that section." In White v. Colorado, 82 F.3d 364, (10th Cir. 1996), the holding in Williams was extended to an employment discrimination claim brought by a state prisoner pursuant to the ADA: "For the same reasoning relied upon in Williams, we hold that the ADA does not apply to prison employment situations either." Id. at 367.

Two other circuit courts have voiced an opinion on the applicability of the ADA to prisons, albeit without expressly ruling on the question. In Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996), the Court of Appeals for the Seventh Circuit held that the ADA did not provide a cause of action to a disabled

state prisoner to challenge the prison's failure to provide guardrails to his bed.  The court concluded that no discrimination occurred because the inmate did not allege that he had been excluded from any prison "service," "program," or "activity."  In so holding, the court expressed some doubt as to the applicability of the ADA to correctional facilities: "Could Congress really have intended disabled prisoners to be mainstreamed into an already highly restricted prison society?"  Without pointing to any evidence of congressional intent which might indicate one way or another the answer to this question, the court opined that "[j]udge-made exceptions . . . to laws of general applicability are justified to avoid absurdity."  Id. at 248-49.

In Torcasio v. Murray, 57 F.3d 1340 (4th Cir. 1995), cert. denied, 116 S. Ct. 772 (1996), the Court of Appeals for the Fourth Circuit strongly intimated that the Rehabilitation Act and the ADA do not apply to state prisons.  The actual holding in Torcasio was that, at the time of the alleged discrimination, it was not clearly established that the ADA and the Rehabilitation Act apply to state prisons, and, consequently, the defendant prison officials were entitled to qualified immunity under these statutes.  The Torcasio court's primary reason for doubting that the statutes cover prisons was that the statutes, although seeming to speak in comprehensive terms   "all the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government," 29 U.S.C. § 794(b)(1)(A) (Rehabilitation Act); "any department, agency, special purpose district, or other instrumentality of a State . . . or local government," 42 U.S.C. § 12131(1) (ADA)   do not expressly recite that prisons are among the "all" or "any" entities covered.  The Fourth Circuit stated: "Because the management of state prisons implicates 'decision[s] of the most fundamental sort for a sovereign entity,' Congress must speak unequivocally before we will conclude that it has 'clearly' subjected state prisons to its enactments."  57 F.3d at 1346 (citation omitted).  In support of its view that the statutory provisions do not speak sufficiently "clearly," the court quoted from Will v. Michigan Dept. of State Police, 491 U.S. 58, 65 (1989), in which the Supreme Court, quoting an earlier pronouncement in Atascadero State Hospital v. Scanlon, 473 U.S. 234, 242 (1985), observed that "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'"

We of course acknowledge that the management of prisons is a governmental responsibility of great importance.  But so too are the management of police and firefighting forces, the management of child protection services, and the management of the court system   state functions routinely understood to be covered by the Rehabilitation Act and the ADA notwithstanding that these functions are not expressly referred to in either of the statutes.  See Thomlison v. City of Omaha, 63 F.3d 786 (8th Cir. 1995) (affirming the denial of summary judgment in a Rehabilitation Act claim brought by a firefighter); Doe v.

Judicial Nominating Commission, 906 F. Supp. 1534 (S.D. Fla. 1995) (holding that the process for judicial nominations must comply with the ADA); Clark v. Virginia Board of Bar Examiners, 880 F. Supp. 430 (E.D. Va. 1995) (holding that requiring state bar applicants to answer questions regarding psychotherapy violates the ADA); Eric L. v. Bird, 848 F. Supp. 303 (D.N.H. 1994) (holding that the plaintiffs had stated an ADA claim in alleging that the state provided foster care services that discriminated on the basis of disability); Ethridge v. Alabama, 847 F. Supp. 903 (M.D. Ala. 1993) (denying summary judgment in an ADA case brought by a disabled police officer); Galloway v. Superior Court of the District of Columbia, 816 F. Supp. 12 (D.D.C. 1993) (holding that the categorical exclusion of blind people from juries violates the ADA).

More to the point, we are not persuaded that the so-called "clear-statement" cases, of which Will is a recent example, have been intended by the Supreme Court to provide a canon of statutory interpretation which can be of help in interpreting statutes whose over-all design indisputably contemplates both that the policies and practices of state (as well as local) governments are required to conform to norms established by Congress and that the remedies include the bringing of a lawsuit in the federal courts. On the contrary, the Court has made it plain that the clear-statement requirement is to be resorted to in those instances in which the text of a federal statute furnishes little real guidance as to whether Congress intended to subject state agencies to potential liability. For instance, in EEOC v. Wyoming, 460 U.S. 226, 243 n.18 (1983), in which the Court examined amendments to the Age Discrimination in Employment Act (ADEA), the Court stated that the clear-statement rule was "a tool with which to divine the meaning of otherwise ambiguous statutory intent." The Court found, however, that the rule offered no guidance on the question raised by the case because "there is no doubt what the intent of Congress was: to extend the application of the ADEA to the States." Id. In Gregory v. Ashcroft, 501 U.S. 452 (1991), the Court examined whether a statutory exemption to the ADEA for "appointee[s] on the policymaking level" included state-court judges. Finding the language of the exemption ambiguous, the Court applied the clear-statement rule and held that, because Congress had not specifically excluded state-court judges from the exemption, state-court judges would be considered to be included in the exempted category. As it had stated in EEOC v. Wyoming, the Court in Gregory v. Ashcroft described the clear-statement rule as "a rule of statutory construction to be applied where statutory intent is ambiguous." Id. at 470.

We think that Will aptly illustrates the scope and limits of the "clear-statement" rule. In that case, which arose in a Michigan state court, Ray Will, a state employee, sued Michigan's Department of State Police and Director of State Police. The gravamen of Will's suit was that the defendants had denied the plaintiff a promotion because of his brother's radical political views, a denial alleged to contravene plaintiff's federal and state constitutional rights. In seeking vindication

of his federal constitutional claims, Will relied on 42 U.S.C. § 1983, the statute which underpins so much federal civil rights litigation, including the case at bar.  Section 1983, which derives from the Civil Rights Act of 1871, provides that "[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  The Michigan Supreme Court concluded that Will's federal claims were not cognizable for the reason that neither a state nor a state official acting in an official capacity is a "person" within the meaning of section 1983.  The United States Supreme Court affirmed.  Prior to Will, which was decided in 1989, the Court had held, in 1978, in Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), that a municipality is a suable "person" within the meaning of section 1983.  But in Will the Court declined to read "person" so broadly as to include the several states.  The Court noted that the construction of section 1983 contended for by Will would, in effect, rewrite the statute in the form "every person, including a State, who under color of any statute . . . subjects," and that this "would be a decidedly awkward way of expressing an intent to subject the States to liability."  491 U.S. at 64.  Cutting strongly against this "awkward" construction that would have made a state suable under section 1983 both in federal courts and in the state's own courts was the fact that in 1979, just a year after Monell, the Court had ruled, in Quern v. Jordan, 440 U.S. 332 (1979), that, by virtue of the Eleventh Amendment's grant to the states of immunity from suit in the federal courts, a federal district court was without jurisdiction to entertain a section 1983 suit seeking to recover money damages from a state.  While recognizing that Congress has the authority, in the exercise of certain of its constitutional powers, to enact legislation overcoming the states' Eleventh Amendment immunity, the Court in Quern found that "§ 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States."  440 U.S. at 345.  In Will, the Court built upon Quern v. Jordan.  Having held in Quern v. Jordan that Congress, in 1871, in enacting section 1983, "had not explicitly and by clear language" evidenced an intent to override the states' Eleventh Amendment immunity, the Court in Will held that, in utilizing the all-purpose but hardly self-defining word "person" in section 1983, Congress had not evidenced an intent to take the major step of bringing state governments as well as local governments within what was in 1871 an unprecedented federal supervisory regime.

In marked contrast with section 1983, the Rehabilitation Act and the ADA both speak expressly of state governments and "any" or "all" of the operations thereof.  Also,

in marked contrast with section 1983, both the Rehabilitation Act and the ADA expressly abrogate the Eleventh Amendment immunity of the states. Against that background, we do not see it as our function to require Congress to specify each of the important components of state governments that comprise Congress' use of the words "any" and "all."

The Fourth Circuit, in Torcasio, supplemented its clear-statement analysis by finding that some of the statutory language did not lead comfortably to prison-based claims. Specifically, the court pointed to 42 U.S.C. § 12131(2), in which the ADA defines a "qualified individual with a disability" as a person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities." According to the Fourth Circuit, correctional facilities do not provide "services," "programs," or "activities," as those terms are ordinarily understood. Furthermore, the court concluded that "[t]he terms 'eligible' and 'participate' imply voluntariness on the part of an applicant who seeks a benefit from the state; they do not bring to mind prisoners who are being held against their will." 57 F.3d at 1347. In the context of the case at bar, arguments of this sort do not seem compelling. Here, it is agreed that the jail is to make certain forms of treatment available to mentally ill inmates. It is appropriate to characterize such treatment as a "service," in that it confers a benefit on the inmates. And the different forms of treatment may be properly described as "programs" in that they are an organized series of events for the provision of the services. Indeed, the treatment regimen at issue is in fact called the "Forensic Support Program." In order to be deemed "qualified" to receive the services offered through this program, one must fall within one or another restricted category of the inmate population i.e., one must be shown to be "eligible" within certain specified criteria of eligibility: one must be mentally ill, not pose an apparent threat to oneself or others, and, of central importance to this appeal, must be charged with no more than a minor, non-violent crime and not have a history of violence. Inmates who meet these criteria "participate" in mental health services by undergoing the treatment protocol chosen by jail officials. The fact that the participation of the inmates may not be voluntary does not alter the conclusion that they do participate.

B.

Having held that the Rehabilitation Act and the ADA apply to correctional facilities, we must now determine how they apply.

The Rehabilitation Act and the ADA prohibit public entities from discriminating on the basis of disability against qualified individuals with disabilities. As previously noted, see supra note 7, section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a
> disability . . . shall, solely by reason of
> her or his disability, be excluded from the

> participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). Moreover, as also previously noted, Title II of the ADA extends the Rehabilitation Act's coverage to all public entities, whether or not they receive federal funds:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

Although the language of the two statutes differs slightly  e.g., the Rehabilitation Act protects against discrimination "solely by reason of . . . disability," whereas the ADA protects against discrimination "by reason of . . . disability"  the standards under the two statutes are identical. McDonald v. Pennsylvania Department of Public Welfare, 62 F.3d 92, 94 (3d Cir. 1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same."). We have held that there are four elements for establishing a violation of section 504: (1) that the plaintiff is an "individual with a disability" as defined under the Act, (2) that the plaintiff is "otherwise qualified" for the program sought or that the plaintiff would be qualified if the defendant made reasonable modifications to the program, (3) that the plaintiff was excluded from the program "solely by reason of her or his disability," and (4) that the program receives federal funds. Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1009 (3d Cir. 1995). With the exception of the fourth element, which is not pertinent to a claim brought under the ADA, the elements of a claim under Title II of the ADA are interchangeable with the elements of a claim under section 504. Thus, an ADA Title II claimant must show (1) that the plaintiff is "qualified" or that the plaintiff would be qualified if the defendant made reasonable modifications, (2) that the plaintiff has a "disability," and (3) that "by reason of such disability," the plaintiff was excluded from a service, program, or activity provided by a public entity.

In applying the disability statutes to prisons, courts must give considerable weight to the unique needs of prison administration and should, when appropriate, defer to the judgments of prison officials. As the Supreme Court stated in Turner v. Safley, 482 U.S. 78 (1987), "[J]udgments regarding prison security 'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert

judgment in such matters.'"  Id. at 86 (quoting Pell v. Procunier, 417 U.S. 817, 827 (1974)).  Thus, in determining whether a plaintiff is qualified for a particular program or service provided by the prison, a court should weigh the plaintiff's qualifications in light of the needs for prison security and other legitimate interests of the prison. Similarly, a court determining the reasonableness of a proposed modification to a program or service provided by a prison should take into account the prison's needs and should ordinarily defer to the views of prison officials.

The issues to which we now turn are (1) whether discrimination against mentally ill inmates because they are charged with violent crimes, or because they have a history of violence, constitutes discrimination "by reason of" disability; and (2) whether inmates who are charged with violent crimes or who have a history of violence are "qualified" for community-based services.

C.

The challenged provision of the May 26, 1995 order is, on its face, neutral with regard to disability.  Under this provision, inmates are excluded from community-based services because they are charged with violent crimes or because they have a history of violence; this provision does not by its terms exclude inmates due to disability.  Accordingly, the County argues that such exclusion is not "by reason of" disability: "[I]nmates are not excluded because they have mental [illnesses], but because they are prisoners who have committed violent crimes."  Appellees' Brief at 27.  In the County's view, exclusion on the basis of violence cannot amount to disability-based discrimination because such exclusion is facially neutral with regard to disability and does not evince discriminatory animus.  We conclude, however, that a facially neutral rule may amount to exclusion "by reason of" disability if such a rule causes a cognizable discriminatory impact.

In NAACP v. Medical Center, Inc., 657 F.2d 1322, 1328 (3d Cir. 1981), we held that proof of discriminatory intent was not required in a Rehabilitation Act case.  Instead, "proof of disparate impact or effects is sufficient."  In Alexander v. Choate, 469 U.S. 287 (1985), the Supreme Court, "assume[d] without deciding that § 504 reaches at least some conduct that has an unjustifiable disparate impact," id. at 299, and held that a Rehabilitation Act plaintiff need not show discriminatory intent: "Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference  of benign neglect."  Id. at 295.  The Court reviewed statements by members of Congress that the Act sought to eliminate, inter alia, "architectural barriers," "discrimination in access to public transportation," "the discriminatory effect of job qualification . . . procedures," and "[d]iscrimination because [disabled individuals] do not have the simplest forms of special educational and rehabilitation services."  Id. at 297.  "These statements," the Court concluded, "would ring hollow if the

resulting legislation could not rectify the harms resulting from action that discriminated by effect as well as by design." Id.at 297.

In Helen L. v. DiDario, 46 F.3d 325, 335 (3d Cir. 1995), we held that proof of discrimination under the ADA, as under the Rehabilitation Act, does not require a showing of discriminatory animus: "Because the ADA evolved from an attempt to remedy the effects of 'benign neglect' resulting from the 'invisibility' of the disabled, Congress could not have intended to limit the Act's protections and prohibitions to circumstances involving deliberate discrimination." See also Crowder v. Kitagawa, 81 F.3d 1480, 1484 (9th Cir. 1996) (holding that the ADA is intended "to cover both intentional discrimination and discrimination as a result of facially neutral laws"). Although in Helen L. we did not explicitly state that a disparate impact claim may be brought under the ADA, that result was implicit in our conclusion that proof of discriminatory intent is not required. In addition, Department of Justice regulations implementing the ADA support the conclusion that the discrimination prohibited by Title II includes seemingly neutral governmental policies which nonetheless have a discriminatory effect on individuals with disabilities. Thus, one regulation provides:

> A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

28 C.F.R. § 35.130(b)(8) (1995). The explanatory comments show that, under this regulation, neutral rules may be actionable if they tend to exclude disabled persons because of some characteristic symptomatic of their disability:

> [R]equiring presentation of a driver's license as the sole means of identification for purposes of paying by check would violate this section in situations where, for example, individuals with severe vision impairments or developmental disabilities or epilepsy are ineligible to receive a driver's license and the use of an alternative means of identification, such as another photo I.D. or credit card, is feasible.

28 C.F.R. Pt. 35, App. A at 461 (1995). In this example, individuals with vision impairment are excluded from purchasing by check because of an incidental implication of their disability. See also id. at 460 (stating that the regulations "prohibit[] both blatantly exclusionary policies or practices and nonessential policies and practices that are neutral on their face, but deny individuals with disabilities an effective

opportunity to participate").

Although we have not previously had occasion to discuss the proof structure of a disparate impact case brought under the disability statutes, the elements of disparate impact cases brought under Title VII are instructive. Under Title VII, the first element of a disparate impact claim is a showing that a facially neutral policy has a disproportionate impact on a protected group. See 42 U.S.C. § 2000e-2(k); Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975); Griggs v. Duke Power Co., 401 U.S. 424 (1971). Under the Rehabilitation Act or the ADA, the equivalent showing is that the challenged policy has a disparate impact on individuals with disabilities. To make such a showing is to establish discrimination "by reason of" disability. On the record before us, we cannot determine whether the challenged portion of the district court's order has a disparate impact on individuals with disabilities.

In order to determine whether the challenged portion of the May 26, 1995 order has discriminatory effects, we must know whether the violence assertedly committed by members of the appellant class was caused by their disabilities. The district court made no factual findings addressing this question. Appellants rely upon a psychologist's affidavit, which states, "It is very common for mental illness to manifest itself through minor forms of physical or what may be viewed as aggressive expression. The acutely mentally ill are often unable to resolve problems they face verbally or with the aid of friends or family members." App. at 68A (Aff. of Lillian L. Meyers, Ph.D). While this affidavit may offer some help, it is extremely vague — for instance, it is unclear what types of mental illnesses are being discussed or what forms of violent behavior are being attributed to such illnesses. Given the absence of factual findings by the district court and with only this affidavit before us, we are not in a position to say how, or if, violence that may have been committed by members of the appellant class is symptomatic of their mental illnesses. As a result, we have no basis for deciding whether exclusion of these class members on the basis of violence is exclusion "by reason of" disability.

D.

Assuming that the challenged criterion causes a disparate impact on members of the appellant class which can be attributed to their disabilities — and that such exclusion therefore constitutes discrimination "by reason of" disability — the district court's order of May 26, 1995 will nonetheless survive an ADA and Rehabilitation Act challenge if the excluded class members fail to show that they are qualified for community-based mental health services. We must therefore examine this element of the Rehabilitation Act and the ADA.

The ADA defines the term "qualified individual with a disability" as

> an individual with a disability who, with or
> without reasonable modifications to rules,
> policies, or practices, the removal of
> architectural, communication, or

transportation barriers, or the provision of
auxiliary aids and services, meets the
essential eligibility requirements for the
receipt of services or the participation in
programs or activities provided by a public
entity.

42 U.S.C. § 12131(2). Under this definition, an individual is "qualified" for the receipt of governmental services if the individual satisfies the "essential eligibility requirements" for receiving the services. A "qualified" individual need not satisfy all the eligibility requirements if "reasonable modifications" can be made to allow the individual to participate. See Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1009 (3d Cir. 1995) ("[A]n individual may be otherwise qualified in some instances even though he cannot meet all of a program's requirements."). In order to determine whether an ADA plaintiff is "qualified," a court must (1) ascertain the eligibility criteria for the challenged activity, (2) determine which criteria are "essential," and (3) determine whether the plaintiff either satisfies the essential criteria or could satisfy these criteria if reasonable modifications were made. As discussed above, we think that as a general rule courts should defer to the judgments of prison officials as to what qualifications are essential and what modifications would be reasonable.

In this case, the eligibility criteria for community-based mental health services include: "Persons must be charged with a minor, non-violent crime and not have a past history of violence." Order of May 26, 1995 at ¶ 5. In this appeal, appellants argue that this is not an "essential" criterion for community-based services. Appellants further argue that the public safety concerns furthered by the challenged criterion can be addressed through individualized assessments of otherwise eligible inmates. Providing such assessments, appellants contend, would be a reasonable modification.

The ADA regulations provide some guidance on which eligibility requirements are "essential" and which are subject to "reasonable modifications":

(7) A public entity shall make reasonable
modifications in policies, practices, or
procedures when the modifications are
necessary to avoid discrimination on the
basis of disability, unless the public entity
can demonstrate that making the modifications
would fundamentally alter the nature of the
service, program, or activity.

(8) A public entity shall not impose or
apply eligibility criteria that screen out or
tend to screen out an individual with a
disability or any class of individuals with
disabilities from fully and equally enjoying
any service, program, or activity, unless

such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

28 C.F.R. § 35.130(b) (1995). Under these provisions, the "essential eligibility requirements" of a public entity's program are those which are "necessary for the provision" of the program and which cannot be modified without "fundamentally alter[ing]" the nature of the program. See Easley v. Snider, 36 F.3d 297, 302 (3d Cir. 1994) (stating, in a section 504 case, "[I]f there is no factual basis in the record demonstrating that accommodating the individual would require a fundamental modification or an undue burden, then the handicapped person is*otherwise* qualified and refusal to waive the requirement is discriminatory.") (emphasis in original); Pottgen v. Missouri State High School Activities Ass'n, 40 F.3d 926, 932-33 (8th Cir. 1994) (R. Arnold, J., dissenting) (stating, in an ADA case, "But if a rule can be modified without doing violence to its essential purposes . . ., I do not believe that it can be 'essential' to the nature of the program or activity to refuse to modify the rule.").

The County argues that allowing violent inmates to participate in the community-based programs would destroy the viability of such programs:

The County will not release violent offenders into the community, nor will the community or the providers accept them. Additionally, it is hard to imagine that a judge will approve their release. If given a choice to either open these programs to all prisoners including violent offenders or shut them down, then the County will be compelled to shut them down. The County will not risk a tragedy in the community which would jeopardize the existence of the other community-based programs. Sustaining the Inmates' argument and thus, accommodating the mental health inmates who are charged with a violent crime, convicted of a violent crime, or possess a past history of violence, with an individualized assessment, would be unreasonable because it would necessitate a modification of an essential nature of the program, as well as, place undue burdens on the County.

Appellees' Brief at 20-21. Although this passage does not precisely articulate what the County considers to be the fundamental purposes of the community-based programs or how these purposes would be jeopardized by providing individualized assessments of inmates charged with violent crimes or who have histories of violence, the statement can be construed as expressing the County's belief that allowing inmates charged with violent crimes or who have a history of violence to participate

in community-based programs would threaten public safety; the County further argues that this threat to safety would undermine public confidence in community-based programs. The County thus appears to assert that an "essential eligibility requirement" for the community-based programs is that an inmate not threaten public safety. We recognize that ensuring public safety is, indeed, essential if the prison is to provide community-based services to mentally ill inmates. The only question is whether the goal of protecting public safety can be accomplished without excluding all mentally ill inmates charged with violent crimes or who have a history of violence.

In School Board of Nassau County v. Arline, 480 U.S. 273 (1987), a case arising under the Rehabilitation Act, the Court recognized that, in some circumstances, the interests of persons with disabilities must be balanced against public health and safety concerns. The ADA implements Arline's conclusion that covered entities must balance the needs of public health and safety against the interests of individuals with disabilities. Title II regulations explicitly adopt the standard articulated in Arline for determining whether providing services to a person with a disability poses an unacceptable risk:

> The determination that a person poses a direct threat to the health or safety of others may not be based on generalizations or stereotypes about the effects of a particular disability. It must be based on an individualized assessment, based on reasonable judgment that relies on current medical evidence or on the best available objective evidence, to determine: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk. This is the test established by the Supreme Court in Arline. Such an inquiry is essential if the law is to achieve its goal of protecting disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to legitimate concerns, such as the need to avoid exposing others to significant health and safety risks.

28 C.F.R. Pt. 35, App. A at 455-56 (1995).

The record on appeal does not contain any factual basis for determining whether, in light of the applicable standards, the threat to public safety posed by inmates charged with, or who have a history of, violence, makes them categorically unqualified for community-based services. There have been no factual findings regarding the risks that such inmates would pose if they were allowed to participate in community-based services. We do not know what types of mental illness the inmates are afflicted

with, the nature of their past violence, and their propensity for violent behavior in the future.  Additionally, the record does not reveal the details of the services provided under the rubric of community-based programs or the safety protections in place for these programs.  Thus, as we noted above, see supra note 2, we do not know the extent of the interaction, if any, between members of the public and those inmates who participate; we similarly do not know what security measures are in place during any such interactions.

We further lack any factual basis for determining whether the modification appellants seek is reasonable.  Rather than a blanket exclusion of all inmates who are charged with, or who have a history of, violence, appellants seek individualized assessments of the risks posed by each inmate who might otherwise be qualified for community-based programs.  Under such a regime, inmates assessed as dangerous would be excluded, while those assessed as safe would be eligible.  While Arline and the ADA regulations recognize a preference for individualized assessments of the qualifications of persons with disabilities, rather than excluding entire categories of disabled persons, the ADA does not require individualized assessments in every case.  The comments to the regulations state:

> A public entity may, however, impose neutral rules and criteria that screen out, or tend to screen out, individuals with disabilities if the criteria are necessary for the safe operation of the program in question.  Examples of safety qualifications that would be justifiable in appropriate circumstances would include eligibility requirements for drivers' license, or a requirement that all participants in a recreational rafting expedition be able to meet a necessary level of swimming proficiency.  Safety requirements must be based on actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities.

28 C.F.R. Pt. 35, App. A at 461 (1995).  Requiring individualized assessments in every case might impose an undue hardship on a covered entity.  See Arline, 480 U.S. at 287 n.17 ("Accommodation is not reasonable if it . . . imposes 'undue financial and administrative burdens'" on a covered entity) (quoting Southeastern Community College v. Davis, 442 U.S. 397, 412 (1979)); Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1009 (3d Cir. 1995) ("[R]equiring accommodation is unreasonable if it would place undue burdens, such as extensive costs, on the recipient of federal funds.").  In order to determine whether requiring individualized assessments would constitute a reasonable modification, a court must weigh the effectiveness of the assessments against the costs they would impose.  Here, the record contains no findings on how effective individual assessments would be in screening out inmates who pose a threat

to public safety.  Nor are there findings on the burdens the County would incur if it were required to make such assessments.

Thus, on the record before us, we cannot determine whether inmates excluded from community-based mental health services on the basis of past violent behavior or on the basis of pending charges of violent conduct are otherwise qualified for these services or whether they could be qualified with reasonable modifications to the services.  As a result, there is a factual dispute regarding whether the modification approved by the district court complies with the ADA.  Accordingly, we hold that the district court abused its discretion in approving the modification of the consent decree without first holding a hearing and issuing factual findings.  See Delaware Valley Citizens' Council v. Pennsylvania, 674 F.2d 976, 981 (3d Cir. 1982).  We will therefore vacate the order modifying the consent decree and remand to the district court.  On remand, the plaintiffs will bear the burden of establishing that they are qualified for the programs at issue and that the proposed screening devices constitute reasonable accommodations to their disabilities.  Given the degree of deference to which prison officials' policies are entitled, the plaintiffs' burden is not a light one.  We believe that a remand is necessary, however, so that the parties may present evidence, and the district court may assess this evidence, in light of the applicable standards which, in this opinion, we have undertaken to clarify.

Conclusion

We conclude that, contrary to appellees' contention, correctional facilities are within the scope of the Rehabilitation Act and the ADA.  However, the record developed in the district court and presented on this appeal does not provide enough information to enable us to determine whether, as appellants contend, the exclusion of certain members of the appellant class from participation in the community-based mental health programs contravenes the Rehabilitation Act and the ADA.  Accordingly, we vacate the order appealed from and remand the case for further consideration by the district court.  On an amplified evidentiary record, the district court will be in a position to prepare factual findings and conclusions of law directed to the following issues: (1) whether the exclusion from community-based mental health services of mentally ill inmates who are charged with violent crimes or who have past histories of violence constitutes discrimination by reason of disability; and (2) whether, with or without reasonable modifications of the services, such inmates are otherwise qualified to participate in community-based mental health services.

INMATES OF THE ALLEGHENY COUNTY JAIL, et al. v. CYRIL H. WECHT, et al., No. 95-3402
BECKER, Circuit Judge, concurring and dissenting.

Judge Pollak has explained convincingly why the Rehabilitation Act (RA) and the Americans with Disabilities Act (ADA) apply to the community-based forensic support program at issue in the case.  I, therefore, join in Part II.A of the

majority opinion.  For the reasons set forth below, I cannot agree that the district court abused its discretion in modifying the consent decree to exclude violent offenders from the forensic program, or that this case should be remanded for a protracted set of hearings.  To that extent, I respectfully dissent.

I.

As the majority aptly notes, a central issue in this appeal is whether mentally ill individuals who have been charged with or committed a violent offense are "qualified" for the forensic program.  As the ADA makes clear, an individual with a disability can still be "qualified" (or "otherwise qualified" in the vernacular of the RA) if he or she can meet the "essential eligibility requirements" of that program with reasonable accommodation, which can include both "reasonable modifications to rules, policies, or practices" and the "provision of auxiliary aids and services."  See 42 U.S.C. § 12131(2).

Obviously, mentally ill violent offenders cannot meet the eligibility requirements of the forensic program without both a modification of the program's existing requirements and an accommodation of their particular condition.  Individuals who have committed or been charged with violent crimes in the past are specifically excluded from program participation, and, even if they receive an individualized assessment, many are not likely to satisfy the essential requirement of any such program –– that they not pose a violent risk in the future –– without treatment.  Therefore, appellants seek the following accommodation:  they propose that mentally ill violent offenders be offered individual psychiatric assessments and that those offenders diagnosed with "treatable" violent tendencies be allowed to take part in the forensic program.

We must determine whether this proposed accommodation is reasonable.  An accommodation is reasonable if it would not "necessitate modification of the essential nature of a program" or "place undue burdens such as extensive costs, on the recipient of federal funds."  Strathie v. Department of Transp., 716 F.2d 227, 230 (3d Cir. 1983).

I do not believe that Judge Cohill abused his discretion when he concluded that Appellants' suggested accommodation was unreasonable.  To me, the issue is plain.  Including violent offenders in a community-release program (like the forensic program at issue here) without doubt changes its "essential nature."  Community-based programs are accepted by the public because they exclude individuals who have committed violent offenses.  It is clear that letting individuals charged with or convicted of murder, rape, or kidnapping into the community –– regardless of whether they can be "treated" –– would cause a significant public outcry and lead to the elimination of the forensic program.  Furthermore, it is undeniable that the enormous cost of requiring individualized psychiatric assessments of all potential releasees would place an unacceptable burden on the Appellees.  In my view, Judge Cohill did not abuse his discretion by considering these realities.  As Appellants are not "qualified" for the program, they need not be allowed to

participate.

                                II.

I also cannot agree with the majority's decision to send this case back to the district court for more factfinding on matters such as the Appellants' "propensity for violent behavior in the future." Majority Opinion at 44. In my view, this is a meaningless exercise. Notwithstanding the conclusory and undocumented affidavit of Lillian Meyers, one the majority itself labels "vague," Majority Opinion at 37, it seems evident that this tremendous expenditure of judicial resources will uncover nothing, for the relevant psychology literature suggests that mental health professionals cannot reliably predict dangerousness, at least not yet.

Although mental health professionals once presumed that they were able to predict violent behavior accurately, beginning in the 1970s researchers began compiling data demonstrating that this assumption was incorrect. See Randy K. Otto, On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature, 18 LAW & PSYCHOL. REV. 43, 45 (1994) [hereinafter Dangerousness Literature]. Indeed, early researchers concluded that mental health professionals were "less accurate than the flip of a coin," see Bruce J. Ennis & Thomas R. Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 CAL. L. REV. 693, 737 (1974), and should be barred from offering testimony. Id. at 733-738; see also American Psychiatric Association, Report of the American Psychiatric Association Task force on Clinical Aspects of the Violent Individual 20 (1974) (concluding that "[n]either psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness."). Charles Ewing, a psychologist and attorney, went so far as to conclude that psychiatrists or psychologists who attempt to predict dangerousness violate their ethical obligations "to render judgments that rested on a scientific basis." Charles P. Ewing, "Dr. Death" and the Case for an Ethical Ban on Psychiatric and Psychological Predictions of Dangerousness in Capital Sentencing Proceedings, 8 AM. J.L. & MED. 407, 418 (1983).

Professor Randy Otto -- a leading researcher -- concludes that although the pessimism of these "first generation" researchers may have been exaggerated, as of 1994, researchers have at best "some" ability to predict dangerousness. Dangerousness Literature, supra at 62-63. "Some" ability to predict dangerousness, of course, is patently insufficient when the safety of the public is at stake. And neither the literature nor the papers in this case reveal any discovery in the last two years that there is any reliable way to predict dangerousness without reference to prior conduct.

It seems to me, therefore, that the venture upon which the majority has set the district court has insufficient promise to justify interfering with its exercise of discretion. I also believe that the cost of this enterprise would be frightful, itself an element of "reasonable accommodation."

III.

The majority's improvident decision is aggravated by the unusual posture of this case. Much like the "trouble with Harry" in the classic Hitchcock movie, the trouble with the forensic program is that it is dead. The program has expired. See Majority Opinion at 47, n.28. Although, as the majority explains, vacatur of the order allows the district court to meet its obligations under the 1989 decree, the 1989 decree provided for an in-house mental health facility, not a community-based program. Therefore, individualized assessments to determine whether violent offenders should be allowed in the community release program will be relevant only if a community release program is again established. If the parties do not again agree to a community release program -- or if Judge Cohill does not approve it -- the majority opinion will be a meaningless exercise. Thus, while the case may be technically justiciable, it seems a wiser exercise of judicial discretion to stay our hand.

I would affirm the order of the district court.